## Richmond

### MARK WALLER RANDOLPH BLAIN

v.

### COMMONWEALTH OF VIRGINIA

No. 1390-86.2

Decided September 6, 1988

---

COUNSEL

John H. McLees, Jr., Public Defender (Richmond Public Defender's Office, on brief), for appellant.

Marla Lynn Graff, Assistant Attorney General (Mary Sue Terry, Attorney General, on brief), for appellee.

OPINION

**COLE, J.** — Mark Blain, a prisoner in the Virginia State Penitentiary, was convicted in a jury trial of robbery and first degree murder and sentenced to twenty-five years and life imprisonment, respectively. His appeal raises the following questions: (1) whether his statements made to investigators during a search of his cell when he had not been given *Miranda* warnings were properly admitted as evidence against him at trial, and (2) whether the trial court properly excluded reputation evidence concerning a Commonwealth's witness that tended to exculpate Blain. We find no error and affirm the convictions.

## I.

On November 30, 1985, at approximately 11:00 p.m., William White, an inmate at the Virginia State Penitentiary, was found stabbed to death in his cell. State Investigator W. P. Terry arrived at the penitentiary shortly before midnight and conducted a crime scene investigation. Based on information obtained during the investigation, a shakedown, or search, of seven inmates' cells, including Blain's, was conducted. Prison investigators had information that Blain was involved in the murder. During the early morning of December 1, 1985, when the inmates were confined to their cells, Investigators Terry and Brown and two uniformed correctional officers went to Blain's cell to search it for evidence of the murder. Pursuant to standard prison procedures, Blain was required to exit his cell and stand on the narrow tier outside. A correctional officer was on each side of him. He testified that he did not feel free to leave, and, in fact, Terry and Brown stated that Blain was not free to leave. Although Terry said Blain was not handcuffed during the search, Blain and Brown said that he was.

During the search of Blain's cell, Terry seized an imitation Rolex watch, a stainless steel ring, and a gold tiger eye ring that were known to belong to White. Terry held up the watch in his left hand and the rings in his right hand. At first, Blain stated that "it" was not his. Terry understood him to be referring to the watch because both Terry and Blain were looking at it rather than the rings. Blain then said that he had purchased the items from an inmate but could not remember which one.

Terry also discovered a Levi denim jacket hanging on a hook in Blain's cell and said to Brown that it was extremely wet. Blain told the officers that he had been playing basketball outside when it had been raining. Blain's other clothing was dry. A forensic examination of the jacket revealed that it had been washed recently and showed traces of fresh blood on the cuff and on the lower front. Blain had no cuts or scrapes at the time that would explain the presence of blood on the jacket.

Terry denied that he had questioned Blain about the jewelry or the jacket. Brown at first could not remember whether Terry had questioned Blain and then he said that Terry had not. However, Brown's investigative notes stated that *"when questioned about the watch . . . Blain said he bought the watch from someone but could not remember his name."* (emphasis added). Brown then conceded that Blain might have been questioned about the watch during the search of his cell, before being advised of his rights.

Blain moved to suppress his statements as obtained in violation of the dictates of *Miranda v. Arizona*, 384 U.S. 436 (1966). The trial court overruled the motion, and Blain was tried and convicted of robbery and first degree murder.

■ "[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized," and the individual must, prior to questioning, be given certain commonly-known warnings. *Miranda*, 384 U.S. at 478-79. Failure to give *Miranda* warnings prior to custodial interrogation requires suppression of any illegally obtained statements. *Id.* at 479. Before *Miranda* is triggered, however, an individual must be both in "custody" and subjected to "interrogation."

■ Blain argues that the fact that he was a prisoner in the Virginia State Penitentiary establishes *ipso facto* that he was in "custody" for purposes of *Miranda*. He bases this argument on *Mathis v. United States*, 391 U.S. 1 (1967), in which the Supreme Court held that a prisoner's fifth amendment rights were violated when he was questioned, without being given his *Miranda* warnings, concerning possible tax evasion while in prison on other charges. However, Blain's conclusion that a prison inmate is automatically in "custody" for purposes of *Miranda* is incorrect.

[Blain's] view of the *Mathis* decision would seriously disrupt prison administration by requiring, as a prudential measure, formal warnings prior to many of the myriad informal conversations between inmates and prison guards which may touch on past or future criminal activity and which may yield potentially incriminating statements useful at trial . . . . [T]his approach would "torture [*Miranda*] to the illogical position of providing greater protection to a prisoner than to his nonimprisoned counterpart."

*United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985) (quoting *Cervantes v. Walker*, 589 F.2d 424, 427 (9th Cir. 1978)). Clearly, "[p]risoners do not have greater Fifth Amendment rights than other persons." *Beamon v. Commonwealth*, 222 Va. 707, 710, 284 S.E.2d 591, 592 (1981).

■ Since a prisoner is not automatically in "custody" because of his status as such, we must determine when, in fact, a prisoner is in "custody" for purposes of *Miranda*. "A rational inmate will always accurately perceive that his ultimate freedom of movement is absolutely restrained and that he is never at liberty to leave." *Conley*, 779 F.2d at 973. Therefore, the test usually applied to determine "custody" is inappropriate and a special test applicable only to prisoners must be developed. The test applied in the fourth and ninth circuits, that we adopt today, is whether there has been "a change in the surroundings of the prisoner which results in an added imposition on his freedom of movement." *Cervantes*, 589 F.2d at 428; *see Conley*, 779 F.2d at 973. A prisoner is in "custody," then, if he is "subjected to more than the usual restraint on a prisoner's liberty to depart." *Id.*

■ Based on the foregoing test, we find that Blain was not in "custody" for purposes of *Miranda*. The evidence must be viewed in the light most favorable to the Commonwealth, granting to it all reasonable inferences fairly deducible therefrom. *Martin v. Commonwealth*, 4 Va. App. 438, 443, 358 S.E.2d 415, 418 (1987). Although the evidence was conflicting, we accept the evidence in the light most favorable to the Commonwealth and conclude that Blain was not handcuffed. During the search, Blain was required to vacate his cell and stand between two correctional officers on the tier outside of his cell. The search was conducted during hours when all inmates were confined to their cells and

when Blain had no freedom of movement other than in his cell. Once Blain exited the cell, it was expedient to have an officer on each side of him because at that time neither he, nor any other prisoner, was permitted to leave his cell. The officers were, in essence, creating a temporary "constructive cell" during the brief period of the search.

The record establishes that the search was made pursuant to standard prison procedures. Whenever any cell in the prison is searched, the prisoner is required to exit the cell in order to permit a thorough search of the cell in an atmosphere as free of coercion as possible. To have several officers and a prisoner in a small cell together could create a hostile situation filled with tension and danger to the officers and make the search of the quarters difficult. Further, Blain was not removed from his cell for the purpose of questioning, but for the purpose of searching it for stolen items pursuant to standard prison procedure applicable to all such searches of the entire prison population. We, therefore, find no "added imposition on [Blain's] freedom of movement" and find that he was not in "custody" for purposes of *Miranda*.

██ We likewise find that Blain was not interrogated within the meaning of *Miranda*. In *Miranda*, the Court stated that "custodial interrogation" means "questioning initiated by law enforcement officers." *Miranda*, 384 U.S. at 444. The Court later held, however, that interrogation includes not only express questioning but also its "functional equivalent." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The Court defined the "functional equivalent" of questioning as "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." *Id.* If a suspect's statement was not foreseeable, then it is volunteered. "Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by [*Miranda*]." *Miranda*, 384 U.S. at 478. We interpret the *Innis* standard as requiring a determination whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.

Blain contends that he was expressly questioned concerning the stolen items and the jean jacket. Although Brown's notes suggest that Blain was questioned, both Brown and Terry denied that he was. The trial court resolved the issue in favor of the Common-

wealth; we are bound to view the evidence in the light most favorable to the Commonwealth. *See Higginbotham v. Commonwealth*, 216 Va. 349, 352, 218 S.E.2d 534, 537 (1975). Therefore, we find that Blain was not expressly questioned. The question remains, however, whether the "functional equivalent" of questioning occurred. We find that it did not. Terry's statements that he had found items belonging to the deceased, White, and holding them up for Brown and Blain to view, were not words or actions reasonably likely to elicit an incriminating response from Blain. Likewise, Terry's stated observation to Brown that Blain's jacket was wet cannot be interpreted as likely to elicit an incriminating response. Terry and Brown were engaged in a search of Blain's cell. Their actions were calculated to produce physical evidence of Blain's involvement. Objectively viewed, their actions were not designed to produce an incriminating response from Blain. Rather, Blain's statements were volunteered and thus do not come within the purview of *Miranda*.

## II.

The Commonwealth's main witness was a co-defendant, Robert Stockman, another inmate whose cell was next to the deceased's. Stockman testified that he and Blain had beaten and robbed White earlier in the day and then returned later, at which time Blain stabbed White to death. The defense theory was that Stockman stole the jewelry from White, beat him, sold the jewelry to Blain, and then stabbed White to death in concert with another inmate. In support of this theory, the defense sought to introduce evidence from Lieutenant Maddox of the Virginia Department of Corrections concerning Stockman's reputation for stealing other prisoners' jewelry and then trying to "strong arm" them into buying it back. Maddox had investigated such complaints against Stockman at the Staunton Correctional Center in 1982. The court did not allow this specific reputation evidence but permitted Maddox to testify concerning Stockman's general reputation for truthfulness and violence. Blain asserts that the trial court's refusal to allow evidence of specific instances of Stockman's behavior was error. We disagree.

The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion. *Coe v. Commonwealth*, 231

Va. 83, 87, 340 S.E.2d 820, 823 (1986). Evidence is admissible if it tends to prove a matter that is properly at issue in the case and if its probative value outweighs policy considerations. *Levine v. City of Lynchburg*, 156 Va. 1007, 1014, 159 S.E.2d 95, 97-98 (1981). The purpose of the evidence in this case was to prove a reason for Stockman to falsify his testimony by showing that he was attempting to avoid being accused of killing White himself. However, the probative value of the evidence was slight. Lieutenant Maddox investigated the complaints against Stockman in 1982; the offense in this case occurred in 1985. Furthermore, the complaints arose out of incidents at the Staunton Correctional Center, not the State Penitentiary. Consequently, the complaints were too remote in time and place to have had any probative value in the present case. Finally, the reputation evidence did not tend to prove the proposition for which it was offered because the jewelry was found in Blain's possession, *not* Stockman's. Thus, the trial court properly excluded the reputation evidence.

For the foregoing reasons, we affirm the convictions.

*Affirmed.*

Baker, J., concurred.

Benton, J., dissenting.

"[W]hen an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." *Miranda v. Arizona*, 384 U.S. 436, 478 (1966). Accordingly, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. Absent other effective means, those procedural safeguards must entail the giving of customary warnings concerning the defendant's rights. *Id.*

"[T]he well considered conclusions of *Miranda* with reference to warnings to be given to a person held in custody" are applicable to individuals confined to a state prison. *Mathis v. United States*, 391 U.S. 1, 4 (1968). Although "[p]risoners do not have greater Fifth Amendment rights than other persons," *Beamon v. Commonwealth*, 222 Va. 707, 710, 284 S.E.2d 591, 592 (1981), "noth-

ing in . . . *Miranda* . . . calls for a curtailment of the warnings to be given persons under interrogation by officers" solely because during the conduct of the interrogation the person is a prisoner. *Mathis*, 391 U.S. at 4-5.

While it is true "that *Miranda* does not affect '*[g]eneral on-the-scene-questioning* as to facts surrounding a crime or *other general questioning of citizens* in the fact-finding process,' " *Beamon*, 222 Va. at 710, 284 S.E.2d at 593 (quoting *Miranda*, 384 U.S. at 477) (emphasis added), the questioning of Blain was clearly not a "general-on-the-scene questioning." The *Beamon* holding is inapplicable to the facts of this case precisely because unlike *Beamon* and *Cervantes v. Walker*, 589 F.2d 424 (9th Cir. 1978), upon which the majority also relies, Blain was not questioned at the scene. Also unlike *Cervantes*, the detention of Blain and the search of his cell were not actions taken in the course of a general, routine administrative search. Rather, the prison authorities had specific "information that . . . Blain was involved in a robbery murder of inmate White," which occurred in White's cell, and went to search Blain's cell for "evidence to connect him to the murder." No other cells on the tier on which Blain's cell is located were searched.

The majority opinion concludes that no additional restraint was placed on Blain's freedom of movement, and thus, Blain was not in custody. The uncontradicted evidence establishes that during the early morning hours while prisoners were asleep and locked in their cells, Blain was awakened by two uniformed correctional officers and two institutional investigators. Blain was removed from his cell, required to stand on the tier outside his cell with a uniformed correctional officer on either side of him, and, according to Blain and Investigator Brown, handcuffed. Investigators Terry and Brown both testified that Blain was essentially immobilized by the guards at his side and was not free to walk away from the spot where he was restrained. The evidence simply does not support the majority opinion's conclusion that the officers did not place additional restrictions on Blain's freedom of movement.

Even under the "test" that the majority opinion adopts from the fourth and ninth federal circuits, Blain was in custody for purposes of *Miranda*. Under any view of the evidence, there was a "change in [Blain's] surroundings" from the relative security and freedom of movement in his cell to immobilization between two

officers "which result[ed] in an added imposition on his freedom of movement." *Cervantes*, 589 F.2d at 428. Blain was "subjected to more than the usual restraint on a prisoner's liberty to depart" and, therefore according to the "test" adopted by the majority opinion, Blain was in custody for purposes of *Miranda*. *United States v. Conley*, 779 F.2d 970, 973 (4th Cir. 1985); *see also Cervantes*, 589 F.2d at 428. The facts of this case clearly establish that even the relatively limited freedom of movement that is afforded prisoners was denied to Blain while his cell was being searched.

The record also clearly establishes that Blain was questioned by the officers before he was given *Miranda* warnings. Investigator Brown's notes taken at the time of the incident unequivocally state that Blain was questioned. To the extent that the trial judge's ruling may be interpreted, as it was by the majority, to be a finding that Blain was not questioned, it is plainly wrong. I respectfully disagree, however, with the majority's assertion that the trial judge found as a fact that Blain was not questioned. The trial judge's conclusion "that it was indeed a voluntary response" does not answer whether Blain was questioned. The record contains no finding that Blain was not questioned. In any event, "the term 'interrogation' under *Miranda* refers not only to express questioning." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). The investigator used "words [and] actions . . . that [he] should [have known were] reasonably likely to elicit an incriminating response" and, thus, committed the "functional equivalent" of interrogation. *Id.* Because the investigator failed to give *Miranda* warnings to Blain prior to the interrogation, the trial court erred in refusing to suppress the statements.

The trial judge also erred in limiting the examination of Lieutenant Maddox of the Virginia Department of Corrections. The Commonwealth's case-in-chief was based largely on the testimony of an inmate, Robert Stockman. Stockman, who previously had been convicted of eight felonies, lived in the cell adjacent to the cell of the murdered inmate. Stockman testified that he and Blain "[w]ent in and took jewelry and [belongings]" and beat the victim. Stockman said that he received only the victim's cigarettes and canteen tickets for his participation and that Blain took the victim's jewelry. Upon cross examination, Stockman conceded that he beat the victim with his fist, choked the victim, jumped on

the victim's chest with his feet, and then left the victim unconscious on the floor. Stockman further testified that he and Blain returned later and dragged the victim from underneath the bed before killing him. Although Stockman acknowledged handling a knife with which the victim was stabbed, he testified that Blain actually stabbed and killed the victim.

Blain's defense was that Stockman beat the victim and took the jewelry from him; that Stockman then sold Blain the jewelry after the victim would not re-purchase his stolen jewelry; and that Stockman together with James Hollingsworth murdered the victim. Blain's evidence established that he and Stockman "did not pal around together" in the penitentiary; that Hollingsworth, who also lived in the cell adjacent to the victim, was Stockman's friend; that Hollingsworth had served time with Stockman in several penal institutions and had escaped from a penal institution with Stockman in 1982; that a freshly washed shirt and pair of trousers were found in Hollingsworth's cell after the stabbing; and that a pair of tennis shoes were found in Hollingsworth's cell consistent with the medical examiner's testimony that the victim apparently had been stomped on the head with a tennis shoe.

The defense then sought to introduce evidence concerning Stockman's reputation. The defense proffered that the testimony of Lieutenant Maddox would establish that he had investigated complaints against Stockman in another penal institution in 1982 and that Stockman was known as an individual who would steal other prisoners' jewelry and then "strong-arm" them into buying back their own property. The trial judge ruled that Maddox would only be permitted to testify about Stockman's general reputation for truthfulness and for violence, but not concerning his reputation for a specific pattern of criminal activity.

The refusal to allow evidence of the reputation of the witness to commit the specific type of crime charged to Blain was error.

> If the testimony . . . was relevant to establish defendant's claim, and violated no specific rule of admissibility, it should not have been stricken. If pertinent to the factual issue or issues involved, and if, when considered in connection with other evidence, it helped to establish the defense or claim relied upon by defendant, or if it added force and strength to

other evidence bearing upon the issue or issues presented, then defendant was entitled to have it considered by the jury.

\* \* \* \*

It is said that all facts having rational probative value are admissible unless some specific rule forbids. However, the weight or probative value is not the criterion or test. If it tends even slightly to prove a fact relevant to any issue in the case and material or forceful in the determination thereof, it is admissible. The criterion of relevancy is whether or not the evidence tends to cast any light upon the subject of the inquiry. There are instances where the circumstances are such that the act in question, while perhaps somewhat remote, is not sufficiently irrelevant to render it inadmissible as a matter of law, and it may have such probative value and legal relevancy that the inferences which may be drawn therefrom are clearly proper for the jury.

*McNeir v. Greer-Hale Chinchilla Ranch*, 194 Va. 623, 628-29, 74 S.E.2d 165, 168-69 (1953)(citation omitted).

In *Barnes v. Commonwealth*, 214 Va. 24, 197 S.E.2d 189 (1973), the Supreme Court held that evidence of the victim's character and reputation for specific acts is relevant when pertinent to the defense. *Id.* at 26, 197 S.E.2d at 190-91; *see also Winfield v. Commonwealth*, 225 Va. 211, 220, 301 S.E.2d 15, 20 (1983)("evidence tending to show . . . a distinctive pattern of past sexual conduct, involving the extortion of money by threat after acts of prostitution, of which [the] alleged conduct in this case was but an example, is relevant, probative, and admissible in . . . defense"). Testimony concerning Stockman's reputation for the specific act of jewelry theft and "strong-arm" intimidation of his victims was probative of Blain's defense and tended to inculpate the Commonwealth's main witness as the criminal agent. It was error to deprive the jury of that evidence. *McNeir*, 194 Va. at 631, 74 S.E.2d at 170; *Karnes v. Commonwealth*, 125 Va. 758, 765-66, 99 S.E. 562, 565 (1919).

For these reasons I would reverse the conviction and remand for a new trial.