COURT OF APPEALS OF VIRGINIA


Present: Judges Benton, Bumgardner and Frank
Argued at Richmond, Virginia


TAVARIO SHAMONT GATES
                                             OPINION BY
v.   Record No. 0547-98-2        JUDGE RUDOLPH BUMGARDNER, III
                                            JULY 27, 1999
COMMONWEALTH OF VIRGINIA


        FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                 James B. Wilkinson, Judge

        John W. Luxton (Morchower, Luxton & Whaley,
        on brief), for appellant.

        Jeffrey S. Shapiro, Assistant Attorney
        General (Mark L. Earley, Attorney General, on
        brief), for appellee.


     Tavario Shamont Gates appeals his convictions of murder of

James Dixon and malicious wounding of Thomas Redford.  He

contends that the trial court erred by denying his motion to

suppress statements he made to the police.  We find that the

police were not interrogating the defendant when he made the

statements.  Accordingly, we affirm the convictions.

     The victim died of multiple gunshot wounds inflicted while

he sat in his car on April 27, 1997.  Redford, who sat in the

front passenger seat, was also shot.  Four months after the

shooting, the police arrested the defendant on an unrelated

charge.  He initially waived his Miranda rights and talked to

the police, but then he asked for an attorney, and the

questioning ceased.  During the interview, the defendant mentioned that he had heard about the James Dixon murder but denied any involvement in it.

Five days later, the police charged the defendant with the instant offenses and obtained arrest warrants.  Two detectives brought the defendant to a police interview room to execute the new warrants.  They did not advise the defendant of his Miranda rights because they were only planning to serve the warrants and were not planning to interrogate him.  The usual police practice was to serve murder warrants in an interview room to keep the accused out of the public eye and away from distractions.

Once in the room, one of the detectives told the defendant that he was under arrest for the murder of James Dixon, and he began reading the warrant to the defendant.  As he read, the defendant became angry and upset, interrupted the detective, and said, "look, if y'all want to know the truth, I am going to tell you the truth."  The detective started taking notes as the defendant continued to talk about the murder.  In the statements he made, the defendant admitted that he was at the scene of the shooting, but he denied shooting either victim.  Neither detective asked the defendant to make a statement, asked him any questions, or made any comment about the evidence against him.

If the detectives interrogated the defendant, any statements to them would be suppressed because they did not advise him of his rights under Miranda v. Arizona, 384 U.S. 436,

479 (1966). Interrogation includes when "a person in custody is subjected to either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980).

The trial court specifically found that the detectives did not question the defendant.[1] The evidence of the Commonwealth supports this finding. The defendant's testimony to the contrary does not dispel the finding. The credibility of the witnesses and the weight to be accorded their testimony are matters solely for the fact finder. See Bridgeman v. Commonwealth, 3 Va. App. 523, 528, 351 S.E.2d 598, 601 (1986). The police did not interrogate the defendant by subjecting him to express questioning.

---

[1] In denying the motion to suppress, the trial court stated:

> [T]he Court doesn't have any problem with
> the case. The Court doesn't believe the
> police officers or the detectives asked any
> questions. It's not unusual to take them
> back in the interview room to serve them
> with warrants to keep them out of the public
> eye and for distraction. So, they took him
> back there, were reading warrants to him,
> and he started talking and the detectives
> listened to him a few minutes, took out his
> pad and wrote it down. To suppress this
> would be ridiculous. Here's a free
> statement given by an individual without any
> interrogation. And to say that that would
> not be admissible is contrary to common
> sense.

Though they asked no express questions, the statements must be suppressed if the detectives' conduct was the functional equivalent of questioning.  The United States Supreme Court defined "functional equivalent" as "any words or actions on the part of the police that the police should know are reasonably likely to elicit an incriminating response from a suspect." Innis, 446 U.S. at 301.  The test is "'whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.'"  Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 238 (1998) (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)). If a statement is "not foreseeable, then it is volunteered." Blain, 7 Va. App. at 15, 371 S.E.2d at 841.

We conclude that there was no functional equivalent of questioning.  The detective stated the charges and began reading the warrant.  They were unprepared to record or memorialize any statements.  They did not have a tape recorder, a video camera, or even a notepad.  The detective, who made notes once the defendant began talking, had to write on paper he retrieved from the defendant's file folder.  Their actions were not "reasonably likely to elicit an incriminating response."  Innis, 446 U.S. at 301.

The room where the detectives executed the warrants did not, by itself, constitute a functional equivalent of interrogation.  It was common for detectives to serve warrants

- 4 -

in an interview room.  Even if it amounted to "subtle compulsion," as the defendant argues, an interview room was not reasonably likely to elicit incriminating responses.  Neither did it create a situation that the detectives should have known would produce incriminating responses.  See id. at 303.

No evidence suggests that the detectives anticipated the defendant would react by making statements.  Their sole purpose was to execute the new warrants.  Interrogation does not include "words or actions by the police which are normally attendant to arrest and custody."  Wright v. Commonwealth, 2 Va. App. 743, 746, 348 S.E.2d 9, 12 (1986).  Accord Pennsylvania v. Muniz, 496 U.S. 582, 603-04 (1990); King v. Commonwealth, 243 Va. 353, 360, 416 S.E.2d 669, 472-73 (1992) (when law enforcement's stated purpose of encounter with defendant is entirely legitimate, to obtain forensic samples, and they did not deviate from that purpose, there was no "interrogation" (citing Miranda and Edwards v. Arizona, 451 U.S. 477 (1981))).

The detectives did not interrogate the defendant either by asking express questions or by actions that were the functional equivalent to express questions.  When the defendant volunteered statements to them, they were not required to ignore what they were hearing.  See Jenkins v. Commonwealth, 244 Va. 445, 453, 423 S.E.2d 360, 365 (1992).  The trial court did not err when it

- 5 -

denied the motion to suppress the statements.  Accordingly, we affirm the convictions.

<u>Affirmed.</u>

Benton, J., dissenting.

Detective David E. Burt testified at trial that he was the chief homicide investigator of the murder of James Dixon, which occurred April 27, 1997.  During the course of his investigation, he "developed Tavario Gates as a suspect," and he "arrest[ed] Gates on August 28, 1997."  Detective Burt testified that after he read Miranda warnings to Gates, the following events occurred during a lengthy custodial interrogation in the detective division:

> Q  Did he decide to waive those rights?
>
> A  Yes, he did.
>
> Q  What did you ask him and what did he tell you about this murder?
>
> A  He denied any involvement.
>
> Q  Were you specific when you were talking about it?
>
> A  Yes, I was.
>
> Q  He said what exactly?
>
> A  He stated that he didn't know anything about, he had heard about it.
>
> Q  But, he didn't know anything about it?
>
> A  Didn't know anything about it or who done it.
>
> Q  Did you see him five days later on September the 3rd, 1997?
>
> A  Yes, I did.
>
> Q  Were you giving him some papers that day?

- 7 -

A  Yes, I was.[2]

The evidence also proved that during the questioning on August 28, which lasted an hour, Gates attempted to terminate the questioning by requesting a lawyer.  His initial request was ignored.  Only after he made a second request for a lawyer was the interview terminated.  At the suppression hearing, Detective Burt testified that although he had given Gates the Miranda warnings on August 28 and had questioned Gates, he was not present in the room when Gates requested a lawyer.  However, before September 3, Detective Burt learned from another detective that Gates had requested a lawyer during the August 28 interrogation.

Several days after the August 28 interrogation, Detective Burt secured a warrant charging Gates with the murder of Dixon. Detective Burt testified that on September 3, he called the jail and arranged to have Gates transferred from the jail so that he could serve arrest warrants on Gates concerning the Dixon matter.  Detective Burt testified that he did not serve the arrest warrant on Gates in the jail or in the detention center because he wanted to use "an area that was more comfortable for

---

[2] Detective Burt's testimony clearly establishes that after Gates was arrested on August 28, he questioned Gates concerning the murder of Dixon.  The record also indicates that five days after Detective Burt served an arrest warrant on Gates for the murder of Tracy Lynn Rollings, he served the warrant on Gates for the murder of Dixon.

both of us, for [Gates] and [Burt]." He decided to serve the warrants in the detective division. Detective Burt acknowledged, however, that taking a jailed prisoner to the detective division posed security problems. He testified that two detectives were present for the serving of the warrant because "we do have policies and procedures about bringing prisoners into our detective division. We have civilian personnel down there and we make all efforts to keep them safe." Despite those safety concerns, Detective Burt intended to take Gates to the room where the detectives first interrogated Gates on August 28, when Gates had twice requested a lawyer before the interview was stopped. Contrary to the trial judge's finding, neither detective testified that this was done to shield Gates, who was then a prisoner, from the public eye or from embarrassment of being served in public with a warrant.

Detective Woody testified that the city jail personnel delivered Gates to "the detention center . . . in the city lock up." He and Detective Burt then took Gates, who was handcuffed, "inside the detective division to the interview room." They saw that the interview room was occupied and then took Gates "to another room that was back in the back." When Detective Woody was asked whether this happened on many occasions, he responded, "I have done it on many occasions, yes." However, Detective Woody also testified he had no knowledge that Gates had said on

August 28 that he wanted a lawyer and did not want to talk to the police.

Detective Burt testified that as he began "filling out" and reading the arrest warrants, Gates became angry. Then the following occurred:

> [Gates] made a statement to the fact that he was tired of me keep coming and asking him to come down from the jail. He said I told y'all before I ain't have nothing else to say. And, he was -- began to become angry. And, as I began to fill out the warrant itself he stated, you know, what are these for? And, I told him that they are additional arrest warrants. I explained that to him and I began to read them to him at that time. And, then he began to interrupt me and stated, look, if y'all want to know the truth I am going to tell you the truth. So, as I continued to execute the warrant that's when he began to make a statement.

Detective Burt testified that he "grabbed a couple of sheets of paper . . . in [a] folder and began to write" as Gates talked about the Dixon incident. Detective Burt also testified that as Gates was talking another detective entered the room and said he had "additional charges, charges perhaps capital murder on him."

Citing Arizona v. Roberson, 486 U.S. 675 (1988), and Edwards v. Arizona, 451 U.S. 477 (1981), Gates correctly asserts that when he exercised his right to counsel during the August interrogation, he was protected from further interrogation or "talks" initiated by the police unless his counsel was present. In Edwards, the Supreme Court held "that an accused, . . .

- 10 -

having expressed his desire to deal with the police only through counsel, is not subject to further interrogation by the authorities until counsel has been made available to him, unless the accused himself initiates further communication, exchanges, or conversations with the police."  451 U.S. at 484-85.  The Court in Roberson held that Edwards applies even when the police interrogate an accused who has invoked his or her right to counsel and the interrogation concerns an investigation separate from the initial interrogation.  See Roberson, 486 U.S. at 682-85.  The Court explained that Edwards is violated even if the police recite the Miranda warning before subsequent interrogations, see Roberson, 486 U.S. at 686, and even if the accused fails to meet with his or her attorney, see Minnick v. Mississippi, 498 U.S. 146, 153 (1990).  Simply put, the police "may not reinitiate interrogation without counsel present."  Id.

The record clearly establishes that Gates did not initiate the meeting where he made his statement and his lawyer was not present.  Instead, at the behest of Detective Burt, Gates was taken to the interrogation room in handcuffs and under guard.  Therefore, Edwards bars the admission of Gates' statement.

The Commonwealth argues, however, that Gates' statement is admissible because Gates was not induced by interrogation to make the statement.  Indeed, Detective Burt testified repeatedly that he did not intend to ask Gates questions.  However, not only does this argument fail to address Edwards and its progeny,

it overlooks the fact that the intent of the investigating officer is irrelevant. "A requirement of actual proof that 'questioning . . . was intended or designed to produce an incriminating response' . . . is contrary to the Supreme Court's admonition that the definition of interrogation 'focuses primarily upon the perceptions of the suspect, rather than the intent of the police.'" Timbers v. Commonwealth, 28 Va. App. 187, 196, 503 S.E.2d 233, 237 (1998) (citations omitted).

Furthermore, I disagree with the proposition that what transpired in the interrogation room was not interrogation or its functional equivalent. The standard we must apply regarding interrogation is as follows:

> [T]he Miranda safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the Miranda safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the

> unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they <u>should have known</u> were reasonably likely to elicit an incriminating response.

<u>Rhode Island v. Innis</u>, 446 U.S. 291, 300-02 (1980) (footnotes omitted).

The Supreme Court noted that "[t]he concern of the Court in <u>Miranda</u> was that the 'interrogation environment' created by the interplay of interrogation and custody would 'subjugate the individual to the will of his examiner' and thereby undermine the privilege against compulsory self-incrimination." <u>Innis</u>, 446 U.S. at 299 (quoting <u>Miranda</u>, 384 U.S. at 457-58). The Court then referenced several police interrogation techniques that <u>Miranda</u> was specifically designed to address and described these practices as follows:

> The police practices that evoked . . . concern [in <u>Miranda</u>] included several that did not involve express questioning. For example, one of the practices discussed in <u>Miranda</u> was the use of line-ups in which a coached witness would pick the defendant as the perpetrator. This was designed to establish that the defendant was in fact guilty as a predicate for further interrogation. A variation on this theme discussed in <u>Miranda</u> was the so-called "reverse line-up" in which a defendant would be identified by coached witnesses as the perpetrator of a fictitious crime, with the object of inducing him to confess to the actual crime of which he was suspected in order to escape the false prosecution.

<u>Innis</u>, 446 U.S. at 299 (citations omitted).  Because of the Supreme Court's concern with such practices, it has consistently held that "custodial interrogation for purposes of <u>Miranda</u> includes both express questioning and words or actions that . . . the officer knows or reasonably should know are likely to 'have . . . the force of a question on the accused,' and therefore be reasonably likely to elicit an incriminating response."  <u>Pennsylvania v. Muniz</u>, 496 U.S. 582, 601 (1990) (citation omitted); <u>see</u> <u>Innis</u>, 446 U.S. at 300-01.

The technique used by Detective Burt to extract Gates' statement is substantially similar to those described in <u>Innis</u>. The technique is founded on the understanding that an accused, when presented with accusations that he or she committed a crime, is likely to make a statement with the goal of either mitigating or rationalizing his or her guilt.  In making a statement, however, the accused often provides information which, when viewed in context with information obtained by police from other sources, may prove the accused guilty.  By moving Gates to the same area where Gates was previously interrogated, informing Gates that he was being charged with murder, and mentioning in Gates' presence that other charges, including capital murder, could be brought against Gates, the detective's procedure had the same effect as the "reverse line-ups" discussed in <u>Miranda</u> and noted in <u>Innis</u>.  The effect was to place Gates in an interrogation setting similar to the

- 14 -

previous session where he was twice required to demand an attorney. The procedure invoked Gates' ire and led to the exploitation of his ire.

The record clearly establishes that the detectives had no administrative reason to take Gates from the jail to a room in the back part of the detective division to serve an arrest warrant on him. Detective Burt was not the person who fingerprinted or photographed arrestees. No evidence proved that those functions occurred in the detective division. When the sheriff's department delivered Gates from the jail to the city "lock up," Gates was in a place where serving the warrant was convenient. No evidence proved the "lock up" was a place in the "public eye." Furthermore, safety issues militated against moving Gates from the "lock up." Detective Burt had to take the precaution of having another detective with him because of the security concern that arises from taking a jailed person into the detective division of the police headquarters.

Clearly, Detective Burt wanted to "talk" to Gates in a setting that was "comfortable." He testified as follows:

> Q  You took him down, you had the warrants charging him with the murder of James Dixon?
>
> A  That's correct.
>
> Q  And, you had to do some paperwork, fingerprinting, and other associated police business in order to serve the warrants?

A   Well, the booking process, fingerprinting, photographing, is actually done by the sheriff's department.

Q   You still had some -- you had to talk to him --

A   Right.

Q   -- a little bit about some -- not about the case but --

A   I had had all this information from a previous situation.

Q   Okay.  You took him back to an interview room to do some, some work; did you not?

A   That's correct.

Q   And, Mr. Gates became upset when you told him he had been charged?

A   That's correct, he did.

Detective Burt knew that Gates had been interrogated in the detective division for an hour on August 28 about the Dixon murder and other issues.  He knew Gates had invoked his right to counsel.  Indeed, the record indicates that when Gates was first questioned, Gates twice had to ask for a lawyer before the police honored his request and ceased the interrogation.  Taking Gates from the jail to a back room in the detective division to be in a "comfortable" place to "talk" without the presence of his attorney cannot be justified by any administrative needs of the police.  When Detective Burt had Detective Woody accompany him as he attempted to "talk" to Gates about "all this information from a previous situation," he employed a "practice

[that was] . . . designed to elicit an incriminating response from the accused."  Innis, 446 U.S. at 301-02 n.7.

In the absence of any administrative justification for the detective's actions, I would hold that Detective Burt should have reasonably expected that his "actions . . . [would] likely . . . 'have . . . the force of [an interrogation] on [Gates],' and therefore be reasonably likely to elicit an incriminating response."  Muniz, 496 U.S. at 601 (citation omitted).  The Supreme Court explicitly has held that "the purpose behind [the] decisions in Miranda and Edwards . . . [was to prevent] government officials from using the coercive nature of confinement to extract confessions that would not be given in an unrestrained environment."  Arizona v. Mauro, 481 U.S. 520, 529-30 (1987).

Because the detective improperly initiated these "talks" and Gates' statements were made in response to the "functional equivalent" of police interrogation, the statements should have been suppressed.  I dissent.