UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present:  Judges Humphreys, Malveaux and Senior Judge Annunziata
Argued at Norfolk, Virginia


JOSHUA RODRIGUS WOOD

                                                    MEMORANDUM OPINION* BY
v.        Record No. 0937-17-1                 JUDGE MARY BENNETT MALVEAUX
                                                         OCTOBER 2, 2018
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF NORFOLK
Everett A. Martin, Jr., Judge

James O. Broccoletti (Randall J. Leeman, Jr.; Zoby, Broccoletti &
Normile, P.C., on brief), for appellant.

Rosemary V. Bourne, Senior Assistant Attorney General (Mark R.
Herring, Attorney General, on brief), for appellee.


        Joshua Rodrigus Wood ("appellant") was convicted of first-degree murder, in violation of

Code § 18.2-32, and use of a firearm in the commission of a felony, in violation of Code

§ 18.2-53.1.[1]  On appeal, he argues that the trial court erred in denying his motion to set aside the

jury verdict because the testimony presented by the Commonwealth's witnesses was directly

contradictory.  Further, he contends that the trial court erred in admitting text messages, as these text

messages constituted inadmissible hearsay.  For the following reasons, we affirm.

---

        * Pursuant to Code § 17.1-413, this opinion is not designated for publication.

        [1] Appellant was also charged with one count of attempted robbery, in violation of Code
§§ 18.2-26 and -58, and an additional count of use of a firearm in the commission of a felony, in
violation of Code § 18.2-53.1.  At the conclusion of the evidence, the court granted appellant's
motion to strike the attempted robbery charge and one count of the use of a firearm in the
commission of a felony charge.

## I. BACKGROUND

At 4:44 a.m. on the morning of July 16, 2014, Officer John Tracey of the Norfolk Police Department received a "shots fired in progress" call. Two minutes later, he arrived at the intersection of Jason Avenue and Hancock Avenue. Tracey found a man with multiple gunshot wounds lying on the grass on the east side of Jason Avenue. The victim, who did not survive, was later identified as Dajuan Glover. Tracey saw five to six individuals standing near the victim, and a large crowd of people behind these individuals. The officer did not observe anyone running away from the scene.

Dr. Wendy Gunther, a forensic pathologist, performed the autopsy. She determined that Glover had been shot between sixteen and twenty-three times, and died from injuries sustained from multiple gunshot wounds. Gunther recovered bullets from Glover's body and turned them over for ballistic analysis.

Allison Milam, a member of the Virginia Department of Forensic Science's firearms and tool mark section, examined forty cartridge casings that had been recovered from the scene of the homicide, as well as bullet and bullet fragments recovered at the autopsy. After examining the casings, Milam determined that they were fired from three distinct firearms, two .40 caliber handguns and one 9mm handgun. She further indicated that the bullets and bullet fragments recovered at the autopsy also were fired from three distinct firearms.

At trial, the Commonwealth presented testimony from several witnesses who were present on the night of Glover's death. Tracy Covil testified that prior to the shooting, on the evening of July 15, 2014, he went to a club in Virginia Beach where he met the victim. Covil was wearing an American flag shirt and an American flag hat that night. Glover, whom Covil knew by his nickname, "D," was with two other individuals. Covil and Glover left the club around midnight, driving separately. Glover followed Covil to his apartment in Virginia Beach,

and, while in the parking lot outside the apartment, one of the other individuals with Glover suggested they go to a house party on Farragut Avenue in Norfolk. The group drove to the party in Glover's black Tahoe. The house party was located at the end of Farragut Avenue where it became a dead end street. Covil, who was driving, parked the Tahoe on the corner at the other end of the block, which was the corner of Farragut Avenue and Jason Avenue.

Covil described the gathering as a "stripper party" with exotic dancers and alcohol available for purchase. Shortly after 4:00 a.m., Glover and Covil decided to leave the party. At this point, Glover was with a dancer, and he told Covil that she was leaving with them. All three walked down Farragut Avenue toward the corner of Farragut Avenue and Jason Avenue where Glover's vehicle was parked. Covil was in front of Glover and the woman who were walking side by side a few feet behind Covil. Covil noticed two men behind the dancer and Glover, and another group of people at the corner who were looking down the sidewalk at them.

Covil walked in front of Glover's Tahoe and approached the driver's side of the vehicle. As he reached for the keys, a man approached him with a gun and demanded money. Covil later identified the man as Roy Turner, appellant's codefendant. Turner took Glover's keys, Covil's wallet, and $10 from Covil's pockets.

During the robbery, Covil saw another man standing a few feet to the left behind Turner. Covil described this man as "heavyset" with "light skin" and "hair;" those descriptors were all Covil could remember. At trial, he was "not able to say" that appellant was the other individual and answered "no" when defense counsel asked if appellant was light-skinned. Covil testified that, when Turner approached him, at that point he was focused on the gun and did not have the ability to see anyone behind him or on the other side of the vehicle.

After Turner robbed Covil, he saw the other man behind Turner pull a gun out of his waistband and start running. Covil heard a commotion, and Turner turned his head. At that

- 3 -

point, Covil ran down Farragut Avenue away from the house party and cut through a yard, running into a wooded area which turned into marsh. Once Covil was in the woods, he heard "a lot of gunshots."

Ricola Lawshea testified at trial that she was a dancer at the party on Farragut Avenue the night Glover was killed. She had known Glover for about ten years and knew that his nickname was "D." Lawshea testified that she saw both appellant and Roy Turner at the party, as well as Glover. Lawshea noticed that Glover was with someone wearing an American flag outfit. She also knew Kareem Turner and testified that he also was at the party. Kareem Turner asked Lawshea to leave with him, but she declined.

Lawshea testified that, when Glover wanted to leave the party, she told him to wait because several people were leaving and she was concerned about what would happen. She noticed that Kareem Turner, Roy Turner, and appellant "stayed back." After waiting for a moment, Lawshea walked out of the party and down the sidewalk with Glover. She testified that the man in the American flag outfit was walking ahead of them but at some point, "just disappeared." Lawshea stopped with Glover at the corner of Farragut Avenue and Jason Avenue. Lawshea was hugging Glover, facing him with her back toward the street. Lawshea testified that, while she was hugging Glover, appellant walked up and pushed her out of the way. Appellant put a gun to Glover's hip and put his arm around Glover. Glover attempted to reach for the gun, and appellant shot him.

After the first gunshot, Lawshea started running back toward the house party. She stopped midway down the street and hid behind a vehicle. She saw appellant "standing over [Glover] shooting at him" from the passenger side window of the vehicle. She also heard "a lot" of gunshots. Lawshea testified that she saw Kareem Turner near the back of Glover's truck when she first stopped at the corner with Glover. Lawshea did not see anyone else in the street

while she was behind the car. She testified that, from the moment appellant pushed her out of the way, her focus was on "the gun and on D."

Lawshea identified appellant as the individual she saw shoot Glover, both in a photo lineup conducted six days after the homicide, as well as at trial.

Sir Thomas Boyd, also at the party on the night of the shooting, testified at appellant's trial. Boyd stated that, at one point during the evening, he went back to his car, which was parked on Jason Avenue. While sitting in the front passenger seat, Boyd saw a man and woman walking in the middle of the street. He then saw two men with guns in their hands walk down the street. At trial, Boyd identified Roy Turner and Kareem Turner as the two men walking down the street. Boyd saw the Turners say something to another individual, whom he could not see, and then he saw them raise their firearms and heard "a lot of gunshots." As he heard the gunshots, Boyd was "[l]aid back in [his] seat" trying to hide. He stated that, during the shooting, he was looking in a particular direction on Jason Avenue. He then saw the Turners come back up the street and pass his car and, after they walked past, he drove away. Boyd testified that he did not see appellant at the time of the shooting.

On July 23, 2014, the police arrested appellant in Virginia Beach. The police observed him using a cell phone and seized it.

FBI Special Agent Wendell Cosenza analyzed cell phone records in the investigation related to Glover's death. He testified that appellant's cell phone, along with the cell phones belonging to Roy Turner and Kareem Turner, utilized certain cell phone towers from 3:30 a.m. to 5:00 a.m. on the morning of July 16. Cosenza testified that, for all three individuals' phones, the crime scene located on Jason Avenue was "within the general coverage area of those towers at the time of the crime."

At trial, the Commonwealth introduced an exhibit displaying appellant's text messages from the morning of the shooting. At 4:12 a.m., prior to the homicide, a text message stating, "were u at," was sent from appellant's phone to Roy Turner's phone. At 4:19 a.m., a message stating, "Out side," was sent from Turner's phone to appellant's phone. At 5:53 a.m., a text message was sent from appellant's cell phone, stating "Ride past that sence bhro." After this message, appellant's phone received several text messages which were deleted but later recovered by law enforcement. Those messages, received from an unknown number, stated, "Pray for some heavy rain," "Its lite," "D's following me,"[2] and "He gone 13 news." The first incoming text message was received at 6:00 a.m., and the last message was received at 6:22 a.m.

Counsel for appellant objected to the proposed admission of the exhibit displaying text messages from appellant's cell phone, specifically the incoming texts from the unknown number. Appellant's counsel objected to the admission of these messages as hearsay because appellant did not respond; therefore, the messages were not an adoption or admission on appellant's part, but rather admissions from an unknown individual. The court ruled the text messages from the unknown number did not constitute hearsay because they were not being offered for the truth of the matters asserted in the messages.

The Commonwealth's exhibit also contained images found on appellant's phone. At 6:32 a.m. on the morning of the shooting, appellant's cell phone captured an image of the crime scene from an online news story. At 7:14 a.m., appellant's phone captured an image of Lawshea's Facebook page. At that time, there was no public knowledge that Lawshea was an eyewitness to Glover's shooting. On July 17, 2014, an image showing an online news story about Kareem Turner's arrest was downloaded onto appellant's phone. On July 21, 2014, at

---

[2] A detective with the Norfolk Police Department testified that "D" was a term used to refer to detectives.

9:03 a.m., another image from an online news story was downloaded onto appellant's phone. That story, from "13 News," was related to two arrests in the case which occurred at that time.

The jury convicted appellant of first-degree murder, in violation of Code § 18.2-32, and use of a firearm in the commission of a felony, in violation of Code § 18.2-53.1. Following the jury trial, appellant filed a motion to set aside the verdict, arguing that the Commonwealth presented witnesses whose testimony was directly contradictory. The court denied this motion, noting that it was "a rare thing to have a murder case where all of the Commonwealth's evidence is consistent" and "[t]hat's why we have a jury." This appeal followed.

## II. ANALYSIS

### A. Motion to Set Aside the Verdict

On appeal, appellant asserts that the trial court erred in denying his motion to set aside the jury's verdict, as the testimony presented by the Commonwealth's own witnesses was directly contradictory.

This Court "will reverse a trial court's refusal to set aside a jury verdict only if that verdict was 'plainly wrong or without evidence to support it.'" Banks v. Commonwealth, 67 Va. App. 273, 288, 795 S.E.2d 908, 915 (2017) (quoting Code § 8.01-680). "If there is evidence to support the convictions, the reviewing court is not permitted to substitute its own judgment, even if its opinion might differ from the conclusions reached by the finder of fact at the trial." Clark v. Commonwealth, 279 Va. 636, 641, 691 S.E.2d 786, 788 (2010) (quoting Commonwealth v. Jenkins, 255 Va. 516, 520, 499 S.E.2d 263, 265 (1998)). When reviewing a sufficiency challenge "based on a motion to set aside the jury's verdict, the key issue is 'whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" Brown v.

Commonwealth, 68 Va. App. 746, 795, 813 S.E.2d 557, 581 (2018) (quoting Maxwell v. Commonwealth, 275 Va. 437, 442, 657 S.E.2d 499, 502 (2008)).

Appellant argues that in the instant case, the Commonwealth's evidence presented two entirely different accounts of the essential facts relating to an element of the crime. Relying on our Supreme Court's decision in Moore v. Commonwealth, 254 Va. 184, 491 S.E.2d 739 (1997), he asserts that these differing accounts undercut the sufficiency of the evidence to support his convictions. In Moore, the victim testified that defendant placed his penis both "in" and "on" her vagina. Id. at 189, 491 S.E.2d at 741. The victim's testimony was the Commonwealth's only evidence of penetration and, based upon this testimony, defendant was convicted of rape of a child under the age of thirteen years. Id. at 191, 491 S.E.2d at 742. On appeal, the Supreme Court, noting that penetration by a penis of a vagina is an essential element of the crime of rape, found that the Commonwealth's evidence "was in a state of equipoise on an essential element of the crime." Id. at 189, 491 S.E.2d at 741. The Court specifically noted that inconsistencies were presented in the Commonwealth's case-in-chief, as opposed to "cross-examination of the victim or a case where there has been other evidence contradicting the testimony of the victim," which would be properly regarded as credibility issues for the jury. Id. at 189, 491 S.E.2d at 742. In contrast to evidence of that nature, the Court held that

> this is a case where the prosecution has presented, from the mouth of the victim, two different accounts of the essential facts relating to a crucial element of the crime. As we have stated, the Commonwealth's evidence must be consistent only with the guilt of the accused. However, in this case, the Commonwealth's evidence is consistent with the innocence of the accused regarding the crime with which he was charged.

Id.

Here, appellant argues that the Commonwealth's direct evidence, like that in Moore, presented two entirely different accounts of the "essential facts relating to a crucial element of

- 8 -

the crime." Id. Appellant asserts that the testimony of Covil and Boyd was directly opposed to that of Lawshea. Appellant claims that, while he was identified by Lawshea as the shooter, Covil and Boyd's accounts establish that he did not shoot Glover; rather, Roy and Kareem Turner were the shooters responsible for Glover's death. Thus, according to appellant, the Commonwealth's evidence stands in a "state of equipoise."

As an initial matter, we find appellant's reliance on Moore misplaced, as the holding of Moore is inapplicable to the instant case. Moore involved inconsistent testimony from one witness, the victim. As the Supreme Court later observed, "[t]he critical factor in Moore was the victim's ambiguous testimony." Horton v. Commonwealth, 255 Va. 606, 615, 499 S.E.2d 258, 262 (1998). Here, appellant does not allege that the testimony of a sole witness was inconsistent; rather, he argues that the testimony of two witnesses was in direct contradiction to the testimony of the witness who saw appellant shoot the victim. Because appellant's argument involves an allegation of contradiction between several witnesses, instead of inconsistent testimony, we find that Moore is irrelevant to the issue at hand.

Further, we find no merit to appellant's claim that the testimony presented by the Commonwealth's witnesses was directly contradictory. Rather, the Commonwealth's evidence established that three separate individuals shot Glover, and the testimony of the three witnesses in question supports the finding that appellant, along with two other individuals, shot Glover on the morning in question.

The medical evidence at trial demonstrated that Glover had been shot between sixteen and twenty-three times, and died from injuries sustained from multiple gunshot wounds. Further, the ballistic evidence established that three separate guns were used to inflict those wounds.

Lawshea testified that Kareem Turner, Roy Turner, and appellant "stayed back" when she left the party with Glover. As they left, she saw Covil, wearing an American flag outfit, walking

ahead of them, but at some point he "just disappeared" from her vision. Just prior to the shooting, Lawshea was hugging Glover, with her back toward the street. Appellant walked up, pushed her out of the way, and put a gun to Glover's hip. When Glover attempted to reach for the gun, appellant shot him. After the first gunshot, Lawshea started running back toward the house party, stopping midway down the street to hide behind a vehicle. Through the car's passenger side window, she saw appellant "standing over [Glover] shooting at him." She also heard "a lot" of gunshots. Lawshea identified appellant as the person she saw shoot Glover in a photo lineup and in court. She testified that she only saw appellant shoot Glover from the view she had from behind the car. However, Lawshea also testified that after she was pushed out of the way by appellant, her focus was on "the gun and on D."

Contrary to appellant's assertion, neither Covil's nor Boyd's testimony was inconsistent with Lawshea's testimony identifying appellant as a shooter.

Covil testified that, after leaving the house party he was walking ahead of Glover and the woman Glover left the party with. Covil approached Glover's Tahoe at the corner of Farragut Avenue and Jason Avenue and reached for the keys. At that point, Roy Turner robbed him. During the robbery, Covil saw another man standing a few feet to the left behind Turner. Covil testified that this other individual was not appellant. Covil further stated that, when Turner approached him, he was focused on the gun and did not have the ability to see anyone behind him or on the other side of the Tahoe. After Turner robbed Covil, Covil saw the other man pull a gun out of his waistband and start running. Covil heard a commotion, which distracted Turner, and Covil was able to run away. While running into the woods nearby, Covil heard "a lot of gunshots."

Covil's testimony did not directly contradict Lawshea's testimony. Covil saw two individuals with guns, one of whom he identified as Roy Turner, standing near Glover's Tahoe.

- 10 -

Covil testified that neither individual was appellant. However, he specifically testified that, while he was being robbed, his attention was on Turner's gun, and he was unable to see anyone else near him at that time. He was able to view Roy Turner and the other individual from his limited vantage point, and then ran away and heard gunshots. His testimony does not establish that appellant was not one of the shooters involved in Glover's killing, and thus is not in contradiction with Lawshea's account.

As with Covil, Boyd's testimony is not directly contradictory to Lawshea's testimony. While seated in the front passenger seat of his car on Jason Avenue, Boyd saw two men with guns in their hands walk down the street. Boyd identified Roy Turner and Kareem Turner as the individuals walking down the street. Boyd saw the Turners say something to another person whom Boyd could not see, and then he heard "a lot of gunshots." During the gunfire, Boyd was "[l]aid back in [his] seat" trying to hide. He saw the Turners come back up the street and pass his car. Boyd testified that he did not see appellant at the time of the shooting.

Based upon this testimony, Boyd's account clearly does not directly contradict Lawshea's testimony identifying appellant as a shooter. While Boyd testified that he did not see appellant at the time of the shooting he witnessed, he was "[l]aid back" in his car in an attempt to hide at that point. Boyd was looking at a particular part of Jason Avenue from his reclined position in the passenger seat. While he saw and identified the Turners as two of the three shooters, his testimony did not establish that appellant was not another shooter out of his field of vision. Accordingly, his testimony was not in direct contradiction with Lawshea's account.

In the instant case, Lawshea unequivocally testified that she saw appellant shoot Glover the morning of July 16. Neither Covil's nor Boyd's testimony, viewed in light of their particular vantage points, directly contradicted Lawshea's identification of appellant. Here, the jury's verdict was supported by Lawshea's testimony, which was not contradicted by Covil or Boyd's

- 11 -

testimony. Thus, the verdict was not plainly wrong or without evidence to support it, and the trial court did not err in refusing to set aside the jury's verdict.[3]

## B. Hearsay

Appellant further argues that the trial court erred in admitting text messages sent to appellant's cell phone because the messages constituted inadmissible hearsay.

"The admissibility of evidence is within the broad discretion of the trial court, and a ruling will not be disturbed on appeal in the absence of an abuse of discretion." Blain v. Commonwealth, 7 Va. App. 10, 16, 371 S.E.2d 838, 842 (1988).

Our Supreme Court has "defined hearsay evidence as 'testimony in court . . . of a statement made out of court, the statement being offered as an assertion to show the truth of matters asserted therein, and thus resting for its value upon the credibility of the out-of-court

---

[3] Appellant further argues that the testimony of FBI Special Agent Cosenza corroborates and bolsters the testimony of Covil and Boyd that "[appellant] was not present when the shooting occurred" because "Agent Cosenza testified that at 4:44 a.m., at the time of the shooting, [appellant's] cell phone was utilizing a different tower to the north of the Jason Avenue area." We find no merit in this argument.

First, appellant's cell phone utilizing a different tower at 4:44 a.m. would not affirmatively establish that appellant was not present at the murder scene. Cosenza did testify that at 4:44 a.m., appellant's cell phone utilized a different tower located to the north of the one that it utilized for several calls between 4:07 a.m. and 4:19 a.m. When counsel for appellant asked Cosenza if the change in cell tower use "would . . . be indicative of the phone moving in a northerly direction," Cosenza replied, "It would be or in the overlap area between the two." Appellant contends that this testimony established that appellant was in a location north of the crime scene at the time of the homicide. However, this testimony does not unequivocally establish that fact; Cosenza testified that the change in towers might have been indicative of appellant's phone moving in a northerly direction, but also might have been indicative of the phone being in "the overlap area" between two towers. Further, Cosenza also testified that the crime scene was within the general coverage area of the tower appellant's cell phone utilized at the time of the homicide.

Even if we accept appellant's contention that Cosenza's testimony established that appellant's cell phone was north of the crime scene at 4:44 a.m., this does not contradict Lawshea's identification of him as one of the shooters. Officer Tracey received a report of a shooting at approximately 4:44 a.m., arrived at the scene at 4:46 a.m., and did not observe anyone running away at that time. Thus, the jury could have inferred that the shooting occurred at some time prior to 4:44 a.m. and that the shooters had left the area and traveled north by the time police arrived.

asserter.'" Jenkins v. Commonwealth, 254 Va. 333, 338-39, 492 S.E.2d 131, 134 (1997) (alteration in original) (quoting Stevenson v. Commonwealth, 218 Va. 462, 465, 237 S.E.2d 779, 781 (1977)). "A statement is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended as an assertion." Va. R. Evid. 2:801(a).

"The hearsay rule excludes out-of-court declarations only when they are 'offered for a special purpose, namely, as *assertions to evidence the truth of the matter asserted*.'" Manetta v. Commonwealth, 231 Va. 123, 127, 340 S.E.2d 828, 830 (1986) (quoting Eckhart v. Commonwealth, 222 Va. 213, 216, 279 S.E.2d 155, 157 (1981)). "If the court can determine, from the context and from the other evidence in the case, that the evidence is offered for a different purpose, the hearsay rule is no barrier to its admission." Id. "Determining whether a statement is offered to prove the truth or falsity of the matter asserted requires an analysis of the purpose for which the statement is offered into evidence." Swain v. Commonwealth, 28 Va. App. 555, 559, 507 S.E.2d 116, 118 (1998). Further, "the mere incantation that hearsay evidence is admitted to prove a proposition other than the truth of the assertion does not cure the hearsay problem. The proposition to be proved must be relevant to the issues at trial." Estes v. Commonwealth, 8 Va. App. 520, 523, 382 S.E.2d 491, 492 (1989).

In the instant case, the Commonwealth introduced an exhibit displaying text messages that were on appellant's cell phone from the morning of the shooting. Included in these messages was one sent from appellant's cell phone at 5:53 a.m., stating "Ride past that sence bhro."[4] After this message, there were several incoming text messages received on appellant's phone, which had been deleted but recovered, the first received at 6:00 a.m. and the last received at 6:22 a.m. Those messages, received from an unknown number, stated, "Pray for some heavy

---

[4] We characterize this statement as both counsel for appellant and the Commonwealth did at trial, as meaning "Ride past that scene, bro."

rain," "It's lite," "D's following me," and "He gone 13 news." Appellant did not object to the admission of the initial message sent by appellant, "Ride past that sence bhro," but did object to the admission of the other messages as inadmissible hearsay. The court ruled that the text messages from the unknown declarant did not constitute hearsay because they were not being offered for the truth of the matter asserted in the messages.

Appellant argues that the trial court's ruling was in error because there is "no question" that the Commonwealth introduced the text messages for their literal truth. We disagree with this contention. We conclude that the trial court did not err in holding that the messages were not hearsay as they were not offered for the truth of the matter asserted in the messages.

Appellant is correct that the Commonwealth's purpose in introducing the messages was to demonstrate that appellant was involved in the shooting. The Commonwealth argued at trial that the probative value of the messages was to show what an unknown declarant did in response to appellant's message to ride past the scene, tending to prove that appellant was involved in the shooting. Here, however, the literal truth of the text messages was not an admission or an acknowledgment that appellant was involved in the shooting. The Commonwealth did not: (1) introduce the message "Pray for some heavy rain" to prove that an unknown individual asked appellant to pray for rain; (2) introduce the message "It's lite" to prove that the rain was in fact light that morning; (3) introduce the message "D's following me" to prove that detectives were following the unknown declarant; or (4) introduce the message "He gone 13 news" to prove that Glover was dead as seen on a news channel. Rather, these messages were introduced because they demonstrated that appellant asked an individual to drive past the crime scene, and that person did drive by and reported back to appellant about conditions at the crime scene, police activity, and Glover's death. Taken in context with appellant's request for the unknown declarant to drive by the crime scene, these messages tended to prove that appellant was involved

with the homicide.  See Hamm v. Commonwealth, 16 Va. App. 150, 155-56, 428 S.E.2d 517, 521 (1993) ("If a statement is offered . . . to explain the declarant's conduct or that of the person to whom it was made, it is not objectionable as hearsay.").

Here, the text messages received by appellant the morning of the shooting did not constitute hearsay because they were not offered "as an assertion to show the truth of the matters asserted therein" and did not rest "for [their] value upon the credibility of the out-of-court asserter." Jenkins, 254 Va. at 338-39, 492 S.E.2d at 134 (quoting Stevenson, 218 Va. at 465, 237 S.E.2d at 781).  Rather, the messages were offered into evidence to demonstrate what an unknown declarant did in response to appellant's message to ride past the crime scene, and to show that the declarant reported back with details about the crime scene and Glover's subsequent death, tending to show that appellant was involved in Glover's homicide.  Therefore, we find that the trial court did not abuse its discretion in admitting the text messages.

### III.  CONCLUSION

We hold that the trial court did not err in denying appellant's motion to set aside the jury verdict, nor did it abuse its discretion in admitting text messages received on appellant's phone the morning of the homicide.  Accordingly, we affirm.

Affirmed.