COURT OF APPEALS OF VIRGINIA


Present: Chief Judge Fitzpatrick, Judges Elder and Agee
Argued at Salem, Virginia


JAMES EDMOND WATTS, A/K/A
 JIMMY BRENNAN DOBSON
                                            OPINION BY
v.    Record No. 2816-00-3         JUDGE G. STEVEN AGEE
                                          APRIL 30, 2002
COMMONWEALTH OF VIRGINIA


          FROM THE CIRCUIT COURT OF THE CITY OF ROANOKE
                    Jonathan M. Apgar, Judge

          Richard L. Derrico (Copenhaver, Ellett,
          Cornelison & Derrico, on brief), for
          appellant.

          Margaret W. Reed, Assistant Attorney General
          (Randolph A. Beales, Attorney General, on
          brief), for appellee.


     James Edward Watts (Watts) was convicted in a Roanoke City

Circuit Court bench trial of forging a public document in

violation of Code § 18.2-168.  He was sentenced to serve a term

of eight months incarceration.  On appeal, he contends the trial

court erred in failing to suppress statements he made to

sheriff's deputies while in custody.  He alleges the statements

were obtained in violation of Miranda v. Arizona, 384 U.S. 436

(1966).  For the following reasons, we affirm the decision of

the trial court.

# I.   BACKGROUND

On January 28, 2000, Watts was arrested on warrants for kidnapping and abduction, and a magistrate committed him to the Roanoke City Jail where Deputies Lanning, Allman and Watkins were on duty.

Upon Watts' arrival at the jail, Deputy Lanning did the initial intake.  Deputy Lanning entered identifying information on Watts, which he received from the arresting officer and the arrest warrants, into the jail's computer database, and fingerprinted Watts using a computerized fingerprinting system. This process is standard operating procedure for all inmates upon admittance to the jail.  Deputy Lanning generated a fingerprint card with the name "James Edmond Watts" printed at the top and asked Watts to sign his name to the card.

Watts reviewed the card and informed the deputy, "That is not my name."  In response, Deputy Lanning instructed Watts to "sign your true name."  Watts proceeded to sign the card, in the presence of Deputies Lanning and Allman, "----Dobson" (the first name being illegible).  Deputy Lanning noticed the discrepancy and informed others in his department and the police that the suspect had signed a name that was "different than what had been printed out."  Deputy Lanning had no further personal interaction with Watts.

Watts was then directed to Deputy Watkins to be "classif[ied] . . . into the general population of the jail," which is also a standard operating procedure for all inmates upon admittance to the jail.  When Watts arrived at Deputy Watkins' duty station, the deputy had a committal card, which noted Watts

was to be held by the Roanoke City Jail, and a jail card which contained the name James Edmond Watts, an address, an abbreviation of the charges against him, and a section to be filled in on "jail housing."

Deputy Watkins' duty is to "determine what the safest housing is for [the] inmate."  This required him to "get a background history, check on [his] record, check on [his] name, stuff like that, get [] personal information, next of kin."  The questions to be asked are provided on a standard form, which the deputy fills out.  "The purpose of the questions is [the Roanoke City Jail has] several housing areas in the jail, and we put people into those housing areas based on, you know, . . . what kind of security risk they are, or whether they have any things that we need to protect them from . . . ."

As Deputy Watkins began this procedure, he "had the information that there was a question about [Watts'] identity." However, he did not know there was a problem with the fingerprint card; in fact, he did not know for certain that Watts had already been fingerprinted.  Deputy Watkins testified that he was not investigating a crime when he obtained answers from Watts for the standard jail housing form.

When Deputy Watkins asked Watts for his name, Watts replied, "Jimmy Brennan Dobson."  He also gave the deputy a birthdate, place of birth and criminal history that were inconsistent with the record on file for "James Edmond Watts."

After completing all the questions on the standard form, Deputy Watkins asked Watts to sign his name to the form that contained the background information.  Watts stated to Deputy

- 3 -

Watkins that "he was not James Watts."  Watts then informed Deputy Watkins that other deputies were telling him to say that he was James Watts and asked the deputy "what he should do." Deputy Watkins "told him he should sign whatever his true, legal name was, and [Watts] signed Jimmy [B.] Dobson, and he corrected [the deputy's] spelling of the name."

Deputy Watkins then completed the classification process by entering the name "James Dobson" into the jail's computer database.  Watching him, Watts asked the deputy what he was doing.  The deputy informed Watts that he "was going to put the alias that he gave . . . in the computer, and . . . [he] was going to have . . . [the] security staff confirm what his identity was."  Watts then said, "No, no, my name is James Watts. Let me go on and sign it that way."  Deputy Watkins refused to allow Watts to amend the signature and turned the matter "over to the Security Staff to run [Watts'] fingerprints again."[1]

Deputy Watkins never informed Watts that he did not have to sign the form or participate in the classification procedures. Deputy Watkins also never informed Watts that "he would get in trouble if he signed a false name to [the] form," nor did he give Watts the Miranda warnings at any time.

The next day, January 29, 2000, Watts was charged with forgery of a public document:  the January 28, 2000 fingerprint card created by Deputy Lanning upon Watts' arrest for abduction

---

[1] Deputy Watkins assumed Watts had been fingerprinted prior to being escorted to his desk; however, he was not positive that is how the processing procedure transpired.  There was no evidence that Deputy Watkins was aware that Deputy Lanning had fingerprinted Watts or of what events had occurred prior to this time between Watts and other members of the jail staff.

and kidnapping.  Watts was then fingerprinted by Deputy Allman on the new charge.  Deputy Allman instructed Watts to sign this additional fingerprint card.  The deputy did not ask any questions of Watts nor did he have any further contact with him.  This second card bore the name "James Watts," and Watts signed it as "James Watts."

Deputy Allman, who was aware of the circumstances giving rise to the forgery charge, did not inform Watts that he had the right to refuse to sign the fingerprint card nor did he provide Watts with the Miranda warnings before asking Watts to sign the card.  Watts did not object to signing the card nor did he challenge the printed name on the card.

Prior to trial on the charge of forgery of a public document, Watts sought to suppress (1) the fingerprint card executed on January 29, 2000, before Deputy Allman; (2) his response to Deputy Watkins' question, "What is your name?"; (3) the jail classification form completed by Deputy Watkins and signed by Watts as "Jimmy B. Dobson"; (4) Watts' statement to Deputy Watkins that other deputies were telling him to say that he was James Watts; (5) his inquiry on "what he should do"; and (6) his statement to Deputy Watkins that he was "James Watts." Watts averred suppression of all the foregoing was required because the deputies failed to advise him of his rights pursuant to Miranda before obtaining the information.

The trial court granted Watts' motion to suppress the January 29, 2000 fingerprint card, but otherwise denied his motion.  The trial court specifically held "there is a routine booking question exception in Virginia."  Its ruling to deny

- 5 -

Watts' motion was based on that exception and a finding that certain of Watts' statements were voluntary and spontaneous utterances and, therefore, outside the scope of Miranda.

Subsequently, Watts was convicted of forging the January 28, 2000 fingerprint card, a public record under Code § 18.2-168. Watts did not object to the testimony of Deputy Lanning regarding what occurred during the January 28, 2000 fingerprinting or to the introduction into evidence of the signature on the January 28, 2000 fingerprint card.

On November 13, 2000, the same day as Watts' sentencing hearing, Watts filed a "Motion for Judgment of Acquittal and Incorporated Memorandum," in which he argued for "a judgment of acquittal based on the admission of evidence that should, respectfully, have been suppressed." In this motion, Watts argued that the trial court should have suppressed the January 28, 2000 fingerprint card. Watts contended that because the deputy knew, or should have known, that Watts was about to lie regarding his identity the deputy should have given him the Miranda warnings. The trial court denied the motion for acquittal and imposed sentence.

On appeal, Watts argues the trial court erred (1) in denying his motion to suppress the jail classification documents and statements made during the classification procedure and (2) the January 28, 2000 fingerprint card and statements made during that fingerprint procedure raised in his motion for judgment of acquittal. Watts cites the failure of the deputies to give him the Miranda warnings as the error requiring reversal. We

- 6 -

disagree and affirm the decisions of the trial court for the following reasons.

## II.  STANDARD OF REVIEW

In reviewing a trial court's denial of a motion to suppress, we view the evidence in the light most favorable to the Commonwealth as the party that prevailed below, and grant to its evidence "all reasonable inferences deducible therefrom."  Giles v. Commonwealth, 28 Va. App. 527, 532, 507 S.E.2d 102, 105 (1998) (citation omitted).  In addition, we review the trial court's findings of historical fact only for "clear error," but we review de novo the trial court's application of defined legal standards to the particular facts of a case.  See Ford v. Commonwealth, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998); see also Ornelas v. United States, 517 U.S. 690, 700 (1996).

## III.  ANALYSIS

The Fifth Amendment protection against self-incrimination

> serves to protect persons in all settings in which their freedom of action is curtailed in any significant way from being compelled to incriminate themselves.  We have concluded that without proper safeguards the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work to undermine the individual's will to resist and to compel him to speak where he would not otherwise do so freely.  In order to combat these pressures and to permit a full opportunity to exercise the privilege against self-incrimination, the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored.

Miranda, 384 U.S. at 467.

The safeguards, now commonly known as "Miranda warnings," are required only when a suspect is both in custody and subjected

- 7 -

to interrogation; the warnings are not required where an individual is simply in custody. <u>Rhode Island v. Innis</u>, 446 U.S. 291, 300 (1980). "By custodial interrogation, we mean questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." <u>Miranda</u>, 384 U.S. at 444. The term "interrogation" means either express questioning or its functional equivalent. <u>See</u> <u>Jenkins v. Commonwealth</u>, 244 Va. 445, 452-53, 423 S.E.2d 360, 365 (1992). The "functional equivalent" of an interrogation is "any words or actions on the part of the police (<u>other than those normally attendant to arrest and custody</u>) that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Innis</u>, 446 U.S. at 301 (emphasis added).

Citing the emphasized language in <u>Innis</u>, we held in <u>Wright v. Commonwealth</u>, 2 Va. App. 743, 348 S.E.2d 9 (1986), that law enforcement officers need not administer <u>Miranda</u> warnings prior to obtaining biographical information for a fingerprint card:

> Under the facts presented here, we believe that [the defendant's] statement concerning his address [made on a fingerprint card] was obtained as a result of conduct normally attendant to arrest and custody. We also note the total absence of any evidence that the questioning here was intended or designed to produce an incriminating response. For these reasons, <u>Miranda</u> warnings were unnecessary.

<u>Id.</u> at 746, 348 S.E.2d at 12.

In <u>Pennsylvania v. Muniz</u>, 496 U.S. 582 (1990), a four-justice plurality of the United States Supreme Court found that the answers to biographical questions asked during booking

- 8 -

"fall within a 'routine booking question' exception which exempts from Miranda's coverage questions to secure the '"biographical data necessary to complete booking or pretrial services."'" Id. at 601. In a footnote, the plurality expounded on this concept: "'[R]ecognizing a "booking exception" to Miranda does not mean, of course, that any question asked during the booking process falls within that exception. Without obtaining a waiver of the suspect's Miranda rights, the police may not ask questions, even during booking, that are designed to elicit incriminatory admissions.'" Id. at 602 n.14 (plurality opinion).

Subsequent to Muniz, we held in Timbers v. Commonwealth, 28 Va. App. 187, 503 S.E.2d 233 (1998), that "[a]ssuming without deciding that a routine booking exception exists in Virginia," the facts on that record took the custodial interrogation outside the exception. Id. at 199, 503 S.E.2d at 238.

With this precedential background in mind, we now examine each of the claimed Miranda violations alleged by Watts.

A. THE JANUARY 28, 2000 FINGERPRINT CARD

Watts alleges the January 28, 2000 fingerprint card, the public document he was convicted of forging, should have been suppressed by the trial court because he had not been given the Miranda warnings prior to signing the card. We disagree.

Although our decision in Wright preceded the United States Supreme Court's decision in Muniz, which used the phrase "routine booking question exception," it is clear we were describing the same principle: "'Police words or actions "normally attendant to arrest and custody" do not constitute interrogation.'" Wright, 2 Va. App. at 746, 348 S.E.2d at 12 (quoting South Dakota v.

- 9 -

Neville, 459 U.S. 553, 564 n.15 (1982)). Accordingly, we hold there is a routine booking question exception in Virginia, "which exempts from Miranda's coverage questions to secure the biographical data necessary to complete booking or pretrial services." Muniz, 496 U.S. at 601. The correctional system requires the collection of such routine biographical information in order to function at even the most basic level and avoid chaos while administering some of society's most dangerous individuals. However, the routine booking question exception "does not mean . . . that any question asked during the booking process falls within that exception. . . . [T]he police may not ask questions, even during booking, that are designed to elicit incriminatory admissions." Id. at 602 n.14.

Deputy Lanning generated the January 28, 2000 fingerprint card during the "booking" procedure upon Watts' arrival at the city jail on the charges of kidnapping and abduction. There is nothing in the record to suggest this process was anything but routine and universal for all inmates. Deputy Lanning simply fingerprinted Watts and instructed him to sign the fingerprint card.

A review of the record clearly reveals that Deputy Lanning did not subject Watts to any form of express questioning or its functional equivalent. The deputy subsequently spoke to Watts only when Watts asked him what name he should sign. Deputy Lanning instructed Watts to sign "his true name." Deputy

Lanning's response was not designed to elicit an incriminating statement from Watts.[2]

Wright clearly supports the finding that the fingerprint card, including Watts' forged signature, and Watts' inquiry to Deputy Lanning, were admissible in evidence without prior Miranda warnings under the routine booking question exception.  Moreover, even if the exception did not apply, the Miranda warnings were not required because neither Deputy Lanning's execution of the fingerprint card nor his direction to Watts to sign the card were actions designed to elicit an incriminating admission.  The trial court correctly denied Watts' motion for judgment of acquittal regarding the statements made to Deputy Lanning and properly admitted the fingerprint card into evidence.

B.  STATEMENTS TO DEPUTY WATKINS

Watts also contends the admission of the jail classification form bearing his false signature and his statements to Deputy Watkins should have been suppressed for lack of Miranda warnings.  Yet, the classification form and Watts' statements to Deputy Watkins were either in response to routine questions asked during the booking procedure or those he made spontaneously.  Therefore, we affirm the decision of the trial court.

The absence of Miranda warnings during the inmate classification procedure does not require suppression of the statements unless the questions asked were designed to elicit an

---

[2] In fact, Watts did not incriminate himself in any crime by forging the card; rather he committed a crime.  The purpose of advising a suspect of the Miranda warnings is to protect that suspect from unwarily incriminating himself based on prior acts, not for the purpose of advising a suspect that he should avoid committing a crime.

incriminatory admission.  Our review, therefore, requires us to determine whether Deputy Watkins interrogated Watts, whether expressly or by its functional equivalent.  See Timbers, 28 Va. App. at 194, 503 S.E.2d at 236 (citing Innis, 446 U.S. at 300-01).

> The test is "'whether an objective observer would view an officer's words or actions as designed to elicit an incriminating response.'"  Timbers[], 28 Va. App. [at] 196, 503 S.E.2d [at] 238 [] (quoting Blain v. Commonwealth, 7 Va. App. 10, 15, 371 S.E.2d 838, 841 (1988)).  If a statement is "not foreseeable, then it is volunteered."  Blain, 7 Va. App. at 15, 371 S.E.2d at 841.

Gates v. Commonwealth, 30 Va. App. 352, 355-56, 516 S.E.2d 731, 733 (1999).  Pursuant to this standard, we hold that Deputy Watkins did not interrogate Watts and, therefore, the trial court was not required to suppress Watts' statements or the jail classification form.

Deputy Watkins merely asked Watts standard biographical questions contained on a procedural form related to his arrest, custody, and placement in inmate housing, a universal incarceration procedure.  The questions were not designed to elicit an incriminating response, but to ascertain the most suitable division of the jail in which to place Watts for his and others' protection.  There is no evidence in the record that Deputy Watkins acted in any way other than to "book" Watts.  At the time of his interaction with Watts, Deputy Watkins knew a question had arisen at some point as to Watts' true identity.  However, he did not know that the suspect had forged the fingerprinting card taken by Deputy Lanning.

The inquiries and admission made by Watts were made voluntarily, without prompting, and not made in response to any interrogation by Deputy Watkins within the meaning of the Miranda decision.  Watts' offer to re-sign the jail classification form with the name "James Watts" was also a spontaneous remark not made in response to anything asked by Watkins.  Where a suspect in custody makes spontaneous admissions, which are not a product of interrogation, the statements are admissible and their admission does not violate the suspect's right against self-incrimination.  See Bradshaw v. Commonwealth, 228 Va. 484, 490, 323 S.E.2d 567, 570-71 (1984).

We are not persuaded by Watts' argument that Timbers, 28 Va. App. 187, 503 S.E.2d 233, requires us to reverse the trial court's decision.  Timbers is clearly distinguishable from the case at bar.

In Timbers, the defendant was arrested for possession of cocaine and was taken to the sheriff's office where Deputy MacFall asked her for identifying information, including her name, birthdate and Social Security number.  The defendant informed the deputy that her name was "Gwendolyn Ann Timbers." After being fingerprinted, the defendant signed the name "Gwendy Timbers," to the fingerprint card and a Central Criminal Records Exchange (CCRE) form.  Subsequently, while Timbers was in a holding cell, a woman came into the lobby of the sheriff's office and left an item of clothing for "Kelly Timbers."  Deputy MacFall testified that he immediately went

> "to the holding cell where we had Ms. Timbers
> and questioned her as to what her real
> identity was."  When asked to specify his

> actions, [Deputy] MacFall testified as follows: "I went to the holding cell door, I called her by the name of Kelly Timbers and she looked at me. And I told her if she was Kelly Timbers, that she needed to come forth with that information."

Id. at 191, 503 S.E.2d at 235. Timbers acknowledged that she was actually "Kelly Timbers." She was not advised of the Miranda warnings at any point prior to this acknowledgement. Timbers was then charged with forgery of the fingerprint card and the CCRE form, and of giving false information to a police officer. Id. at 192, 503 S.E.2d at 235.

Applying the objective person standard from Blain, 7 Va. App. 10, 371 S.E.2d 838, we held the deputy's statements to Timbers while in the holding cell constituted interrogation. After learning that Timbers' real name was probably Kelly Timbers rather than "Gwendolyn Timbers," the deputy intentionally went to the holding cell door and called her by the name "Kelly Timbers." He sought to investigate what he believed to be a false information crime.

> In the first testimony he gave on the issue, [Deputy] MacFall described this exchange as "question[ing] her as to what her real identity was." After appellant looked at [Deputy] MacFall, [Deputy] MacFall told her that if she was Kelly Timbers, she needed to admit that fact. [Deputy] MacFall testified that in response to these statements, [Timbers] "came clean to me and said that she was actually Kelly Yvette Timbers." A reasonable observer would view [Deputy] MacFall's statements as designed to elicit [Timbers'] incriminating statement that she was, in fact, Kelly Timbers.

Timbers, 28 Va. App. at 197, 503 S.E.2d at 237. We, therefore, held her admission to being Kelly Timbers should have been suppressed.

Deputy MacFall's inquiries to Timbers constituted interrogation in violation of <u>Miranda</u> because the officer was clearly investigating a prior criminal act and intended to elicit an incriminating response from Timbers. Deputy MacFall's inquiries to Timbers were not those to which all inmates were subjected as a matter of course for basic inmate processing. By contrast, Deputy Watkins' inquiries to Watts were all routine booking questions common to all inmates and necessitated as a matter of course in order to operate the jail and make adequate arrangements for the inmate's incarceration. Deputy Watkins was not in the process of investigating a crime, but simply trying to classify Watts into the inmate population.

Since Watts was not subjected to a custodial interrogation, the <u>Miranda</u> decision does not protect his answers during the booking process and his spontaneous remarks. The trial court did not err in refusing to suppress them.

Accordingly, the decision of the trial court is affirmed.

<u>Affirmed.</u>