COURT OF APPEALS OF VIRGINIA

Present:   Judges Frank, McCullough and Senior Judge Annunziata
Argued at Alexandria, Virginia


XAVIER JAMMAL PINCKNEY

v.        Record No. 0902-10-4

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION* BY
JUDGE ROSEMARIE ANNUNZIATA
FEBRUARY 28, 2012


FROM THE CIRCUIT COURT OF PRINCE WILLIAM COUNTY
Mary Grace O'Brien, Judge

Mark Crossland (Mark B. Williams, on briefs), for appellant.

Jennifer C. Williamson, Assistant Attorney General (Kenneth T.
Cuccinelli, II, Attorney General, on brief), for appellee.


On appeal from his convictions of capital murder, robbery, and related firearm offenses,

Xavier Jammal Pinckney contends the trial court erred in denying his motion to suppress his

statements and evidence obtained based upon those statements.  We affirm the trial court's ruling.

Background

"In reviewing a trial court's denial of a motion to suppress, '[t]he burden is upon [the

defendant] to show that th[e] ruling, when the evidence is considered most favorably to the

Commonwealth, constituted reversible error.'"  McGee v. Commonwealth, 25 Va. App. 193,

197, 487 S.E.2d 259, 261 (1997) (en banc) (quoting Fore v. Commonwealth, 220 Va. 1007,

1010, 265 S.E.2d 729, 731 (1980)).  "In addition, we review the trial court's findings of

historical fact only for 'clear error,'[1] but we review de novo the trial court's application of

---

* Pursuant to Code § 17.1-413, this opinion is not designated for publication.

[1] "In Virginia, questions of fact are binding on appeal unless 'plainly wrong.'"  McGee, 25
Va. App. at 198 n.1, 487 S.E.2d at 261 n.1 (citations omitted).

defined legal standards to the particular facts of a case." Watts v. Commonwealth, 38 Va. App. 206, 213, 562 S.E.2d 699, 702-03 (2002) (citing Ornelas v. United States, 517 U.S. 690, 700 (1996); Ford v. Commonwealth, 28 Va. App. 249, 255, 503 S.E.2d 803, 805 (1998)) (footnote added).

Detectives Barlow, Masterson, and Burke investigated a December 19, 2008 burglary and double murder of Jean Smith and her son, James, inside their home. After receiving information that appellant may have been in the area at the time of the crimes, Masterson and Barlow visited appellant's home around noon on December 21, 2008, to speak with him.

Barlow was familiar with appellant and his mother from a prior unrelated incident and asked appellant's mother if appellant was home. Appellant was seventeen years old at the time. His mother asked what the detectives wanted, and Barlow said they were investigating a break-in in the area and needed to speak with him. Appellant entered the room. Barlow told appellant there was an incident, a person who fit appellant's description was seen in the area, and he "asked [appellant] if he'd come down to the police station, I needed to talk to him." Appellant did not ask any questions nor voice any opposition. Instead, he left momentarily to put on shoes and returned. Appellant's "mother offered to give him a ride down to the station." Barlow testified that he "advised [the mother] she could if she wanted to, but I said I'll be glad to take him down and bring him back when we were done talking to him." The mother did not contest that decision, accompany or follow them to the station, but instead remained at her home. As a standard safety precaution, the detectives patted down appellant before allowing him to sit in the police car, however, they did not search or restrain him. During the ride to the station, Masterson indicated he was surprised appellant's mother did not want to come to the station. In response, appellant told Masterson "that he had told her that he didn't want her to come [because] it might be awhile." The remainder of their conversation was casual. They talked

about the holidays and did not discuss the crime. Upon their arrival at the station, the detectives signed appellant in as a visitor and gave him a visitor's pass to wear.

A camera in the interview room recorded everything that happened after appellant arrived at the station. The entire videotaped session lasted over ten hours. The police advised appellant of his Miranda rights approximately five and one-half hours into the interview.

Detective Burke was the lead investigator in the case and participated in much of the interview with appellant. Burke explained there were other potential suspects in the case, including a relative and an ex-boyfriend of a girl who dated James Smith. Burke described the interview as "very cordial." When asked why they did not Mirandize appellant when he initially arrived, Burke testified as follows:

> We were just interviewing him like - - after a murder, when a murder occurs, we interview a lot of people. A lot of people at the scene that are - - you know, depending on their MO's, prior history, prior criminal history, we do a lot of interviewing.

During the interview, appellant demonstrated he had prior experience with the criminal justice system. For example, he advised the detectives he was reluctant to provide too much information because they had used statements against him in the past, and he indicated he was familiar with gunshot residue and polygraph testing. During the course of the interview, the police provided appellant with two meals and drinks, as well as breaks to use the restroom and stretch. The discussion did not focus exclusively on the crime, but included discussions about other topics such as appellant's interest in military service.

Burke testified that he personally spoke with ten to twelve witnesses and that approximately thirty witnesses were interviewed at the station. Although four detectives may have spoken with appellant, there were never more than two detectives in the room with appellant at any time, and Detectives Burke and Masterson conducted most of the interview.

The officers did not display any weapons. At some point, appellant prepared a written statement without being asked to do so.

Appellant made statements during the interview that the detectives determined were false. When confronted about the false information, appellant changed his story. For example, appellant initially said he was in school at the time, which proved to be false. He also spent between one and two hours using a map to show where he had jogged that day, stating he was not in the area where the witness had seen him. Appellant finally admitted he was inside the home, but said there was another male named "Kyle" with him. After appellant admitted breaking into the house with Kyle and being present when the shootings took place, Burke advised him of his Miranda rights. Burke did not arrest appellant at that point because he was uncertain whether appellant was merely a witness or was actively involved in the shootings. Around 10:30 p.m., Burke told appellant he would not continue the interview much longer and said he needed to know the truth. Appellant volunteered to provide a written statement if Burke would allow him to see his girlfriend.

At the suppression hearing, appellant testified that the police were "quite polite to him" and not coercive, and he limited his argument to the fact "he was in custody for Miranda purposes and he should have been read his rights from the outset."

After considering all the evidence and viewing the entire video recording of the ten-hour interview, the trial court found that appellant was not in custody prior to being advised of his Miranda rights. Regarding the interview, the trial court observed that appellant "was questioned pretty much by one officer at [a] time, Detective Masterson at the beginning, and then Detective Burke. They were occasionally in the room together, but it was mainly one on one." The trial court emphasized the fact that appellant was treated as a visitor rather than a suspect at the police station and that he was not restrained in any way. Although appellant was only seventeen years

- 4 -

old, the trial court noted that appellant has had extensive prior experience with the criminal justice system as a defendant and as a victim. Despite the length of time that preceded the Miranda warnings, the trial court noted appellant had been given several breaks and times when he was left alone. It also noted that lengthy "administrative" discussions about appellant unrelated to the crimes had occurred during the interview. Moreover, the trial court found the detectives were non-confrontational. Based on these factual premises, the trial court found that the initial conversation with appellant "was not custodial" and, by order entered September 16, 2009, it denied the motion to suppress.

On September 28, 2009, following a bench trial, the trial court found appellant not guilty of two of the four capital murder charges and found appellant guilty of two counts of capital murder, two counts of using a firearm in the commission of murder, one count of robbery, and one count of using a firearm in the commission of robbery. [2] However, at the sentencing hearing on February 19, 2010, the trial court reconsidered that ruling, found appellant guilty of four counts of capital murder, and imposed four life sentences without parole.

## Analysis

### I. Custody

In his first assignment of error, appellant contends the trial court erred in finding he was not in custody before he was advised of his rights pursuant to Miranda v. Arizona, 384 U.S. 476 (1961), and denying his motion to suppress.

"The burden is on the defendant to show that the denial of his suppression motion, when the evidence is considered in the light most favorable to the Commonwealth, was reversible

---

[2] The decision to find appellant not guilty of two of the capital murder counts was made based on legal argument from counsel. Appellant does not challenge the trial court's later decision to find him guilty and impose sentences on four charges of capital murder.

error." McCain v. Commonwealth, 261 Va. 483, 490, 545 S.E.2d 541, 545 (2001) (citing Fore, 220 Va. at 1010, 265 S.E.2d at 731).

The United States Supreme Court has held that an individual must be warned of the right to an attorney and the right to remain silent when the "individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning." Miranda, 384 U.S. at 478. Because "Miranda warnings are implicated only during a custodial interrogation," Aldridge v. Commonwealth, 44 Va. App. 618, 641, 606 S.E.2d 539, 550 (2004), "'police officers are not required to administer Miranda warnings to everyone whom they question,' and Miranda warnings are not required when the interviewee's freedom has not been so restricted as to render him or her 'in custody,'" Harris v. Commonwealth, 27 Va. App. 554, 564, 500 S.E.2d 257, 261-62 (1998) (quoting Oregon v. Mathiason, 429 U.S. 492, 495 (1977)).

Whether an individual is "in custody" for Miranda purposes is "determined by the circumstances of each case, and the 'ultimate issue is simply whether there is a "formal arrest or restraint on freedom of movement" of the degree associated with formal arrest.'" Id. at 564, 500 S.E.2d at 262 (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)). "That determination 'depends on the objective circumstances of the interrogation, not on the subjective views harbored by either the interrogating officers or the person being questioned.'" Aldridge, 44 Va. App. at 542, 606 S.E.2d at 551 (quoting Stansbury v. California, 511 U.S. 318, 323 (1994)). "If a reasonable person in the suspect's position would have understood that he or she was under arrest, then the police are required to provide Miranda warnings before questioning." Harris, 27 Va. App. at 564, 500 S.E.2d at 262.

"The totality of circumstances must be considered in determining whether the suspect is in custody when questioned . . . ." Wass v. Commonwealth, 5 Va. App. 27, 32, 359 S.E.2d 836,

839 (1987). Circumstances we consider in determining whether an individual is "in custody" include the following:

> (1) the manner in which the individual is summoned by the police, (2) the familiarity or neutrality of the surroundings, (3) the number of officers present, (4) the degree of physical restraint, (5) the duration and character of the interrogation, and (6) the extent to which the officers' beliefs concerning the potential culpability of the individual being questioned were manifested to the individual.

Harris, 27 Va. App. at 565, 500 S.E.2d at 262. But, "[n]o single factor is dispositive of the issue." Id. at 566, 500 S.E.2d at 262 (citing Wass, 5 Va. App. at 33, 359 S.E.2d at 839).

The mere fact that an interview takes place at the police station is not determinative. "It is the custodial nature rather than the location of the interrogation that triggers the necessity of giving Miranda warnings." Coleman v. Commonwealth, 226 Va. 31, 47, 307 S.E.2d 864, 872 (1983). "'[T]he requirement of warnings [is not] to be imposed simply because the questioning takes place in the station house, or because the questioned person is one whom the police suspect.'" Aldridge, 44 Va. App. at 644, 606 S.E.2d at 552 (quoting Mathiason, 429 U.S. at 495).

In this case, two detectives, one of whom was familiar with appellant and his mother, visited his mother's house and asked to speak with appellant about a possible break-in. Although the mother volunteered to transport appellant to the station, she accepted the detectives' offer to give appellant a ride. Moreover, appellant told his mother not to come because it might take too long. At the station, the detectives had appellant sign in as a visitor and gave him a visitor's pass. The detectives did not restrain appellant at any time, and there were only one or two detectives speaking with appellant during the interview. Although more than five hours passed before the detectives Mirandized appellant, the interview remained non-confrontational and non-coercive and involved a free exchange between the detectives and appellant. The officers provided several breaks, and at no time did appellant seek to end the interview or ask to leave.

Moreover, the record demonstrates that appellant had extensive prior experience with the criminal justice system and possessed a keen awareness of police procedures. A reasonable person in appellant's situation would not determine that he was in custody prior to being advised of <u>Miranda</u>. Accordingly, the trial court did not err in refusing to suppress appellant's statements.

## II. Fruit of the Poisonous Tree

Because we find that appellant was not in custody for purposes of <u>Miranda</u>, his statements are admissible. Even had a Fifth Amendment violation occurred, such a violation does not require suppression of the physical fruits of a suspect's unwarned but voluntary statements. <u>United States v. Patane</u>, 542 U.S. 630, 634 (2004) (plurality op.).

Accordingly, we affirm the trial court.

<u>Affirmed.</u>