COURT OF APPEALS OF VIRGINIA

UNPUBLISHED

Present:   Chief Judge Decker, Judge O'Brien and Senior Judge Humphreys
Argued by videoconference


LARRY ALLEN YOUNG, JR.
                                                    MEMORANDUM OPINION* BY
v.        Record No. 0466-24-2                      JUDGE ROBERT J. HUMPHREYS
                                                    JUNE 17, 2025
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF MADISON COUNTY
David B. Franzen, Judge

Thomas M. Wilson for appellant.

William K. Hamilton, Senior Assistant Attorney General (Jason S.
Miyares, Attorney General, on brief), for appellee.


Upon his conditional guilty plea under Code § 19.2-254, the circuit court convicted Larry

Allen Young, Jr., of first-degree murder, armed burglary, felonious use of a firearm, maliciously

discharging a firearm in a building, larceny of a firearm, and transporting a firearm while subject to

a protective order.  The circuit court sentenced Young to imprisonment for life plus 83 years and 12

months, with 50 years and 12 months suspended.  As permitted by the conditional plea agreement,

Young appeals adverse rulings of the circuit court at hearings conducted on September 26 and

November 8, 2023.

BACKGROUND

I.  Proffered Evidence at Guilty Plea Hearing

At the hearing upon Young's guilty plea, the Commonwealth proffered evidence that on

February 28, 2022, Young was scheduled to surrender to law enforcement for arrest on a warrant

---

* This opinion is not designated for publication.  *See* Code § 17.1-413(A).

charging him with a criminal offense against a child or family member in Orange County. An emergency protective order that had been entered against Young expired at midnight on February 28, 2022. That day, Young broke into the home of Thomas Nicholson and stole three firearms, including a Ruger handgun.

On the afternoon of February 28, 2022, family members found Darrin Hayward's dead body in their home in Madison County. Hayward had been shot in the head with Nicholson's stolen Ruger handgun and also injured with a blunt object, possibly a sledgehammer. Hayward's body was wrapped in a rug and left near the basement stairs. A rifle was stolen from the family's collection.

That same day, Young was involved in an abduction incident at the central parking garage on the grounds of the University of Virginia (UVA) in Charlottesville. Afterward, Young left a truck behind in the garage and fled on foot.

Police then discovered that Young had climbed seven or eight levels of construction scaffolding on the outside of Alderman Library at UVA. Young called 911, advised that he had a gun, demanded to speak with his estranged wife, and asked for a negotiator. Captain Newberry of the Charlottesville police and Officer Wallace of the UVA police climbed the scaffolding to attempt negotiation with Young. Captain Newberry used his cellphone to allow Young to speak to his wife. Young begged his wife to let him talk to his daughter because he recognized he was "not coming home for a long time." Young eventually admitted that he was suicidal and should be taken to the hospital.

After Young descended from the scaffolding and officers were patting him down for weapons, he cautioned them to watch for blood on his pants and boots, indicating that this was something "they would talk about later." During a conversation with Tony Frazier, the head of security at UVA, Young mentioned that "someone was not okay," but did not elaborate.

During a mental evaluation at UVA Medical Center later, Young said that he had intended to commit suicide at the scaffolding. He also said he would have engaged in a shootout with law enforcement at the site had he not recognized Officer Wallace, with whom he had worked in security at UVA Hospital.

At the hospital, Detective Pluta interviewed Young. Young admitted stealing the guns from Nicholson's home. During the interview, Detective Pluta mentioned that Young had told Frazier that someone was not "okay." Young responded by asking if he could talk to an attorney about that first. The officer confirmed that it was Young's right not to answer, but expressed concern that someone was in peril or danger. Young said that no one was in danger. A second officer in the room, Officer Stuart, asked if someone was hurt. Young said yes, but repeated that no one was in danger.

After obtaining a warrant, the police searched the truck Young had driven and left behind in the UVA parking garage. The police found both the stolen Ruger and another gun that belonged to Nicholson in the truck. DNA testing proved that Hayward's blood was on Young's pants.

The circuit court accepted Young's guilty plea, which reserved his right to appeal rulings of the circuit court from two previous hearings on September 26 and November 8, 2023. The circuit court convicted Young for the six offenses and sentenced him.

## II. Hearing and Rulings on September 26, 2023

The parties appeared at a hearing on September 26, 2023, on counsel-filed motions to suppress and to appoint a special prosecutor in the case.

### A. Suppression

Young's written motion to suppress his statements to the police alleged that Officer Matthew McBee and Frazier had detained him, questioned him without the benefit of his

*Miranda*[1] warnings, said that Young was not in trouble, and urged him to talk to police investigators.[2] Young claimed that he later made incriminating statements to Detective Pluta and Officer Stuart without being advised of his *Miranda* rights. The motion also alleged that Young "was going through a mental episode at the time, as evidenced by the" emergency commitment order.

At the September 26, 2023 hearing, defense counsel initially focused his argument on whether police unlawfully interrogated Young without *Miranda* warnings after he was transported to the hospital. Young affirmed that he was not challenging the admissibility of his volunteered statements, when he encountered the police at the scaffolding, that there was blood on his pants and that the police should put on gloves before patting him down due to the presence of blood. But he disputed that Detective Pluta read the *Miranda* warnings before questioning him at the hospital.

In response, the Commonwealth played body-worn camera video of the encounter between the police and Young at the hospital. The recording showed that immediately upon entering the room where Young was held at the hospital, Detective Pluta introduced himself; he and Young recognized each other as having met before. The detective then read Young his rights under *Miranda*. Young confirmed that he understood his rights. When asked if he wanted to waive his rights and speak to the police, Young responded that he had "no problem" talking to

---

[1] *Miranda v. Arizona*, 384 U.S. 436 (1966).

[2] The written motion also alleged that the police unlawfully searched the truck in the parking garage and obtained evidence. At the September 26, 2023 hearing, Young contended that he was "cajoled" by the police into giving them the key to the truck and revealing the truck's location so that they could obtain the guns inside. He asserted that evidence was removed from the truck without his consent or a warrant. The Commonwealth responded that the truck was searched under a warrant that was sealed in the Circuit Court of the City of Charlottesville. The circuit court took under advisement the motion to suppress evidence relating to evidence seized from the truck. But the circuit court never ruled on the that issue, and Young does not pursue that claim on appeal, so we do not consider this question.

the officers, but that he wanted to change his clothes and have the handcuffs moved from his back to the front. The officers agreed, adjusted the handcuffs to the front of Young's body, and asked medical personnel for a pair of medical scrubs that Young could wear.

Young then described the events of the previous few days: stealing the guns from Nicholson, traveling to Charlottesville, driving his brother's truck to the UVA parking garage, climbing the scaffolding, interacting with the police outside Alderman Library, and ultimately surrendering. Eventually, Detective Pluta asked Young about a statement he made to Frazier that "somebody is not okay" and who that person might be. In response, Young asked if it was all right for him to first tell an attorney, then the attorney could tell the detective. Detective Pluta confirmed that it was Young's right not to answer, but expressed concern that someone was in peril or danger. Young said that no one was in danger. Officer Stuart then asked if someone was hurt. Young said yes, but repeated that no one was in danger. Young said he did not want to answer any more questions, and the interview ended.

After viewing that body camera video of the interview, and apparently abandoning any claim of a *Miranda* violation during police questioning at the hospital, defense counsel then asserted that Young's statement while at the scaffolding site that "somebody was hurt" was obtained in violation of his *Miranda* rights. The Commonwealth responded that there was no recording of any interaction between Young and Frazier, who was not wearing a body-worn camera. The prosecutor stated that the only evidence of an interaction was an email she received from Frazier. In the email, Frazier said he had noticed blood on Young's pants when putting him in the police car for transport to the hospital, and asked if Young had cut himself. Frazier said that Young responded that "someone was not okay or something along those lines." When Frazier asked for more information, Young said he needed to talk to a lawyer, and the conversation ended.

- 5 -

Defense counsel agreed with the circuit court that it was reasonable for Frazier to inquire about Young's well-being without first advising him of *Miranda*. But he then claimed that Detective Pluta could not lawfully question Young, even with advisement of *Miranda* at the hospital, after Young invoked his right to counsel to Frazier.

The Commonwealth asserted that Frazier, as head of UVA security, was not a police officer. The Commonwealth then played a portion of the recording from Officer Wallace's camera as he drove Young from the scaffolding site at Alderman Library to the hospital. The video recorded Young asking Officer Wallace which detective he should talk to if he had done something earlier. Officer Wallace then asked Young to pause so that Officer Wallace could stop the car and read his *Miranda* rights. Young acknowledged that Officer Wallace had not asked him questions about what Young may have done. The circuit court ruled, and defense counsel agreed, that Young, while he was being transported in the police vehicle, reinitiated conversation with Officer Wallace about the events that had happened.

Defense counsel finally contended that any statement Young made while in the hospital was involuntary due to his emotional state and the emergency commitment order that was issued for him. After viewing the video, demonstrating Young's composure during his encounter with Detective Pluta, the circuit court found that Young was responsive and was alert to both time and place despite his upsetting emotions. Thus, the circuit court found Young's statement to the police and his waiver of his *Miranda* rights were voluntary.

## B. Special Prosecutor

Young testified at the September 26, 2023 hearing concerning his request for appointment of a special prosecutor. Before the offenses occurred on February 28, 2022, Young had worked as a security officer at the UVA Medical Center in Charlottesville. During that time, a female, identified as A.R., alleged that Young sexually assaulted her while they were both in

high school. After discussing the allegation at the sheriff's office, Young's employer placed him on administrative leave. No criminal charges were filed against Young, but he was terminated from his job with UVA security. Young claimed that he was terminated because he was falsely charged with not cooperating with the investigation.

Young also stated that in January and February of 2022, Abby Nicholson (Abby), a Madison County deputy sheriff, demanded that he pay her $2,000 to avoid her disclosing a sexual video involving the two of them when they were juveniles. He claimed that Abby threatened to have Clarissa Berry, the Madison County Commonwealth's Attorney, prosecute him based on the content of the video if he did not pay her the money. Young admitted that he never communicated with Berry or anyone in her office about the matter. He testified that he was unnerved by the appearance of Berry at a recent court proceeding against him in Orange County.

Defense counsel argued for the appointment of a special prosecutor because Young believed that the Madison County authorities were "out to get him" based upon the circumstances involving A.R. and Abby. The prosecutor responded that there was no actual evidence that the video existed, of any wrongdoing by Abby, of the basis for his termination from UVA security, or of any basis for recusal of the Commonwealth's Attorney's office. Noting the absence of any allegation of nefarious conduct involving the Commonwealth's Attorney's office, the circuit court denied the motion for appointment of a special prosecutor.

### III. Hearing and Ruling on November 8, 2023

Young represented himself at a November 8, 2023 hearing on a *pro se* suppression motion. After the September 26, 2023 hearing, the circuit court had granted defense counsel's motion to withdraw and Young's motion to represent himself. Young's motion alleged that his statements were involuntary and the product of police coercion. At the hearing, the circuit court

found that there were insufficient "indicia of reliability" to support his motion to suppress and denied it.

ANALYSIS

I.

"In reviewing the denial of a motion to suppress, we 'consider the facts in the light most favorable to the Commonwealth, the prevailing party at trial.'" *Aponte v. Commonwealth*, 68 Va. App. 146, 156 (2017) (quoting *Hairston v. Commonwealth*, 67 Va. App. 552, 560 (2017)). "It is the appellant's burden to show that when viewing the evidence in such a manner, the circuit court committed reversible error." *Id.* (quoting *Hairston*, 67 Va. App. at 560).

On appeal, Young contends that the circuit court erred by refusing to suppress two statements that he made on the night of February 28, 2022. First, he contends that police unlawfully interrogated him without the benefit of *Miranda* warnings when Frazier asked if Young had cut himself, and Young responded that "someone is not okay." Second, he maintains that the police violated his constitutional rights by asking, while he was in the police cruiser, about the location of the gun, and he responded, "it was like two things above me."

*A.  Statement that "someone is not okay"*

"The principle is now well-established that, pursuant to the Fifth Amendment of the United States Constitution, law enforcement officers must inform a suspect in a custodial interrogation of certain rights, including the right to remain silent and to have the assistance and presence of legal counsel during the interrogation." *Bass v. Commonwealth*, 70 Va. App. 522, 539-40 (2019) (quoting *Stevens v. Commonwealth*, 283 Va. 296, 302 (2012)). In *Rhode Island v. Innis*, 446 U.S. 291, 300-01 (1980), the United States Supreme Court found that, in the context of *Miranda*, interrogation includes police communication that is the "functional equivalent" of questioning. *Watts v. Commonwealth*, 38 Va. App. 206, 214 (2002)). "The 'functional

- 8 -

equivalent' of an interrogation is 'any words or actions on the part of the police (*other than those normally attendant to arrest and custody*) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'" *Id.* (quoting *Innis*, 446 U.S. at 301).

Upon noticing blood on Young's pants, Frazier asked if he had cut himself. Nothing suggests that Frazier posed the question for any purpose other than determining whether Young was injured and needed medical treatment. Thus, the question was not reasonably likely to elicit an incriminating response. Indeed, Young's answer was not directly responsive, and he volunteered the information that someone was "not okay." Thus, Frazier's communication was not the "functional equivalent" of interrogation requiring the benefit of *Miranda* warnings. The circuit court did not err in denying the motion to suppress Young's statement that "someone was not okay."[3]

### B. Statement about the gun's location

On appeal, Young maintains that his statement while in the police cruiser concerning the location of a gun was the product of unlawful custodial police interrogation and that the circuit court should have suppressed it. Young identifies a portion of video recorded by Officer Wallace's camera when Young said that the gun was "like two things above me." But the record does not reflect that this portion of Officer Wallace's body camera footage was played at the September 26, 2023 hearing, that the statement was ever mentioned at either suppression

---

[3] In any event, at the suppression hearing, defense counsel ultimately agreed with the circuit court that it was reasonable for Frazier to inquire about Young's well-being without first advising him of *Miranda*. "A party may not approbate and reprobate by taking successive positions in the course of litigation that are either inconsistent with each other or mutually contradictory." *Cangiano v. LSH Bldg. Co.*, 271 Va. 171, 181 (2006). "The doctrine protects a basic tenet of fair play: No one should be permitted, in the language of the vernacular, to talk through both sides of his mouth." *W. Refin. Yorktown, Inc. v. Cnty. of York*, 292 Va. 804, 826 (2016) (quoting *Wooten v. Bank of Am., N.A.*, 290 Va. 306, 310 (2015)). Therefore, it is arguable that Young waived this portion of his claim.

hearing, or that Young made any specific argument that the circuit court should suppress that statement.

"No ruling of the trial court . . . will be considered as a basis for reversal unless an objection was stated with reasonable certainty at the time of the ruling, except for good cause shown or to enable this Court to attain the ends of justice." Rule 5A:18. "The purpose of th[e] contemporaneous objection requirement [in Rule 5A:18] is to allow the trial court a fair opportunity to resolve the issue at trial, thereby preventing unnecessary appeals and retrials." *Creamer v. Commonwealth*, 64 Va. App. 185, 195 (2015). "Specificity and timeliness undergird the contemporaneous-objection rule, animate its highly practical purpose, and allow the rule to resonate with simplicity." *Bethea v. Commonwealth*, 297 Va. 730, 743 (2019). "Not just any objection will do. It must be both *specific* and *timely*—so that the trial judge would know the particular point being made in time to do something about it." *Id.* (quoting *Dickerson v. Commonwealth*, 58 Va. App. 351, 356 (2011)). If a party fails to timely and specifically object, he waives his argument on appeal. *Arrington v. Commonwealth*, 53 Va. App. 635, 641 (2009).

By making no argument in the circuit court about his statement about the location of the gun, Young failed to preserve any claim that the circuit court should have suppressed it. Young does not invoke the good cause or ends of justice exceptions to Rule 5A:18, and the Court will not apply the exceptions sua sponte. *Edwards v. Commonwealth*, 41 Va. App. 752, 761 (2003) (en banc). Accordingly, Rule 5A:18 bars our consideration of this portion of the assignment of error on appeal.

II.

In the second assignment of error, Young appears to argue that the circuit court erred in refusing to find that his statements on February 28, 2022 were involuntary because he was experiencing a mental health crisis. Statements are made "voluntarily" when they are "the

product of a free and deliberate choice rather than intimidation, coercion or deception." *Moran v. Burbine*, 475 U.S. 412, 421 (1986). "Although we defer to the court's findings of historical fact unless plainly wrong or without evidentiary support, we review the legal question of voluntariness *de novo*." *Keepers v. Commonwealth*, 72 Va. App. 17, 40 (2020) (citing *Washington v. Commonwealth*, 43 Va. App. 291, 300 (2004)). To determine whether "the statement was the product of an essentially free and unconstrained choice by its maker," we consider the totality of the circumstances, "including not only the details of the interrogation, but also the characteristics of the accused[.]" *Id.* (quoting *Novak v. Commonwealth*, 20 Va. App. 373, 386-87 (1995)). Such characteristics include his "age, intelligence, mental and physical condition, background and experience with the criminal justice system[.]" *Id.* at 41 (quoting *Washington*, 43 Va. App. at 302-03). Police conduct is also relevant, such as "interrogation techniques employed, including evidence of trickery and deceit, psychological pressure, threats or promises of leniency, and duration and circumstances of the interrogation." *Id.* (quoting *Terrell v. Commonwealth*, 12 Va. App. 285, 291 (1991)). In any event, however, "[c]oercive police activity is a 'necessary predicate' to finding that a confession was involuntary." *Thomas v. Commonwealth*, 72 Va. App. 560, 580 (2020) (quoting *Colorado v. Connelly*, 479 U.S. 157, 167 (1986)).

Young concedes that there was no overt coercion by police. Instead, he essentially argues that the coercive mechanism was his own mental state during his encounter with the police. Young cites no authority for his novel proposition that his statements should have been suppressed because in the mental state he was in, he coerced himself into making them.

The sole reason for the prophylactic sanction of the suppression of illegally obtained evidence is the deterrence of police misconduct. *See, e.g.*, *Connelly*, 479 U.S. at 166. We find no evidence of coercion on the part of the police to render Young's statements involuntary. At

the hospital and at Young's request, Detective Pluta and Officer Stuart moved Young's handcuffs to the front of his body, and inquired about obtaining a change of clothing for him. Detective Pluta read Young his *Miranda* rights, and Young said that he understood. Young, who had personal experience working in security and with the police, agreed to speak with the officers. While he was emotional during portions of the conversation, at no point did the officers threaten or coerce Young to continue. Indeed, the officers respected Young's decision to end the interview, recognizing that it was his right to do so. Because the record contains no evidence of coercive conduct by the police, we do not disturb the trial court's conclusion that Young's statements to the police were voluntary.

### III.

Young contends that the circuit court erred in denying his motion to disqualify the office of the Madison County Commonwealth's Attorney and appoint a special prosecutor in the matter. "The decision whether to disqualify a Commonwealth's attorney in a particular case is committed to the sound discretion of the trial court." *Lux v. Commonwealth*, 24 Va. App. 561, 569 (1997). On appeal, this Court reviews a trial court's refusal to recuse the Office of the Commonwealth's Attorney for an abuse of discretion. *See Fisher v. Commonwealth*, 16 Va. App. 447, 456 (1993). "Whether a prosecutor has a conflict of interest is a question 'dependent upon the circumstances of the individual case, and the burden is on the party seeking disqualification . . . to present evidence establishing the existence of disqualifying bias or prejudice.'" *Brown v. Commonwealth*, 74 Va. App. 721, 737 (2022) (quoting *Powell v. Commonwealth*, 267 Va. 107, 138 (2004)).

Although Young claimed to be a victim of blackmail by a member of the Madison County Sheriff's Office, he admitted that he had no contact with the Madison County Commonwealth's Attorney or anyone in her office in relation to the situation. Even assuming

- 12 -

that Abby threatened Young with prosecution for the alleged video's content if he did not pay her, nothing suggested that the local prosecutor or her staff were involved in any such scheme. Accordingly, Young failed to demonstrate any disqualifying bias or prejudice, and the circuit court did not abuse its discretion in refusing to appoint a special prosecutor in the case.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court.

*Affirmed.*